UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
UNITED STATES OF AMERICA                            :
                                                    :   Docket No.: 12-CR-171 (S-1) (JPO)
         -v-                                        :
                                                    :
MIKHAIL ZEMLYANSKY,                                 :
         et al.,                                    :
                                                    :
                  Defendants.                       :
                                                    :
                                                    :
                                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# MEMORANDUM OF LAW IN SUPPORT OF
# MICHAEL DANILOVICH'S OMNIBUS PRETRIAL MOTIONS


January 18, 2013

CREIZMAN PLLC
Eric M. Creizman (EC-7684)
565 Fifth Avenue, Fl. 7
New York, New York 10017
Tel.:  (212) 972-0200
Fax:  (646) 200-5022
Email:  ecreiz@creizmanllc.com

## **TABLE OF CONTENTS**
**Page**

PRELIMINARY STATEMENT……………………………………………………………….1

PRETRIAL MOTIONS……………………………………………………………………...4

   I.  The Mail Fraud Charge Based On The "Fraudulent Incorporation"
Theory Should Be Dismissed…………………………………………………………..4

   II.  The Court Should Strike Prejudicial Surplusage From The Indictment ………...10

   III.  The Government Should Produce Contemporaneous Notes Of Michael Danilovich's
Post-Arrest Statements……………………………………………………….……11

CONCLUSION……………………………………………………………………….……12

## **TABLE OF AUTHORITIES**
**Page**

*Cleveland v. United States*, 531 U.S. 12 (2000)……………………………..… passim

*Fountain v. United States*, 357 F.3d 250 (2d. Cir. 2004) ………....….. . . ..…..…..….4

*McNally v. United States*, 483 U.S. 350 (1987)…………………………………….4

*Metroscan Imaging, O.C. v. Geico Ins. Co.*,
   13 Misc.2d 35 (N.Y. Civ. 2006)………………………………………………..8

*Pasquantino v. United States*, 544 U.S. 349 (2005)……………………….……..4

*State Farm Mut. Ins. Co. v. Mallela*, 4 N.Y.3d 313 (2005)……….……….………6,7

*United States v. Aleynikov*. 737 F. Supp. 2d 173  (S.D.N.Y. 2006)……..…………..4

*United States v. Alkaabi*, 223 F. Supp. 2d 583 (D.N.J. 2002)……….……………..9

*United States v. Carlo*, 507 F. 3d 799 (2d Cir. 2007)………………….…………5

*United States v. DeFabritus*, 605 F.Supp. 1538 (S.D.N.Y.  1985)……….………..11

*United States v. DePalma*, 461 F.Supp. 779 (S.D.N.Y.  1978).….……..….………..11

*United States v. DiNome*, 86 F.3d 277 (2d Cir. 1996)……………….……………5

*United States v. Evans*, 844 F.2d 36 (2d Cir. 1988)……………………….………7,9,10

*United States v. Ferguson*, 478 F.Supp. 2d 220 (D. Conn. 2007)…..……..….……..12

*United States v. Ferrara*, 709 F.Supp. 39 (E.D.N.Y 1988)……………….…………7

*United States v. Henry*, 29 F.3d 112 (3d Cir. 1994)….…………….…..………..8

*United States v. Ionia Mgt. S.A.*,
   2007 WL 2298570 (D. Conn.  Aug. 3, 2007)……………………….…..………..12

*United States v. Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994)… ………………..……5, 6

*United States v. Scarpa*, 913 F.2d 993 (2d Cir. 1990)…………………….…………10

*United States v. Shellef*, 191 F.3d 326 (2d Cir. 1999)………………….……..6

*United States v. Stein*, 424 F.Supp. 2d 720 (S.D.N.Y. 2006)…....……………..…..11

*United States v. Trie*, 21 F. Supp. 2d (D.D.C. 1998)………………………………………..4

*United States v. Turner*, 465 F.3d 667 (6th Cir. 2006)…………………………………...5

*United States v. Velastegui*, 199 F.3d 590 (2d Cir. 1999)… ..…………………………...4

*United States v. Victor Teicher & Co., L.P.*,
   726 F.Supp. 1424 (S.D.N.Y. 1989) ……………….…….…………………………….. 10

*United States v. Walker*, 191 F.3d 326 (2d Cir. 1999)…………………………………...4

Michael Danilovich, by his attorneys, submits this memorandum of law in support of his pretrial motions to: (i) dismiss the mail fraud count of the Indictment to the extent it is based on the "fraudulent incorporation" theory because no cognizable "money or property" interest is implicated within the meaning of the federal mail fraud statute; (ii) strike surplusage from the Indictment; and (iii) order the government to produce contemporaneous notes made of Mr. Danilovich's post-arrest statements.

In addition, Mr. Danilovich specifically joins in: (i) Yuriy Zayonts' motion to strike the fraudulent incorporation theory from the indictment and preclude the government from introducing at trial evidence in support of the fraudulent incorporation theory; and (ii) Mikhail Zemlyansky's motion to suppress wiretap evidence.

### PRELIMINARY STATEMENT

In what the government has trumpeted as the "largest no-fault automobile insurance fraud case charged to date,"[1] 36 defendants are alleged to have participated in a highly-sophisticated scheme to defraud insurance companies of over $279 million during a five-year period. One of the two theories on which this massive criminal prosecution is based addresses the defendants' alleged misuse of the corporate form to enable health care clinics owned by laypersons to participate in New York's no-fault insurance program. New York's no-fault insurance laws permit health care clinics, as assignees of no-fault benefits, to collect payment from insurance companies for services provided to individuals injured in automobile accidents. In order to obtain reimbursement, however, clinics, among other

---

[1] *See* Press Release, U.S. Attorney's Office Southern District of New York, "Manhattan U.S. Attorney Announces Charges Against 36 Individuals For Participating In $279 Health Care Fraud Scheme," Feb. 29, 2012, available at http://www.justice.gov/usao/nys/pressreleases/February12/zemlyanskymikhailetalindictment.html.

requirements, must be owned and operated by physicians who practice through the corporation. 11 N.Y.C.R.R. § 65-3.16(a)(12). According to the Indictment, the defendants participated in a scheme to operate clinics that were owned by laypersons, conceal the true ownership of the clinics, and apply for reimbursement of no-fault medical services they provided. Under this "fraudulent incorporation" theory of mail fraud, the government seeks to obtain criminal convictions with substantial potential Guidelines sentences based solely on the layperson-owned clinics' act of billing the insurance companies for services rendered. Under the fraudulent incorporation theory, piercing the corporate veil is wholly sufficient to establish criminal liability. It is irrelevant whether the layperson-owned clinics delivered actual medical services to patients, or that the services were performed by licensed physicians and other health care providers, or that the services provided were medically necessary. According to the government, every single dollar billed to insurers was part of a federal mail fraud violation simply because the clinics were owned by laypersons and not licensed health care providers.

  The government's expansive use of the mail fraud statute under the fraudulent incorporation theory parallels the enormous scale of this criminal case. As an initial matter, this mail fraud prosecution attempts to convert alleged violations of a comprehensive state regulatory scheme into federal crimes. Furthermore, it seeks to penalize conduct that is *malum prohibitum* on the same order and with the same force as it does conduct that is *malum in se*, such as the other theory on which the government basis its mail fraud claim: billing for unnecessary and non-existent services.

  As discussed below, the fraudulent incorporation theory is a legally insufficient basis on which to prosecute a federal mail fraud charge. A federal mail fraud violation

2

requires a fraudulent scheme to obtain money or property of a victim.  Here, the alleged fraudulent incorporation scheme implicates the insurance carrier's right to withhold funds for reimbursement of layperson-owned clinics.  That right is a benefit conferred on insurers by New York State solely as an instrument of regulation designed to deter the "corporate practice of medicine" by incentivizing insurers not to do business with layperson-owned clinics.  However, it is not a property right of the insurer.  The insurer lacks lawful discretion to *pay* ineligible health care clinics, even if the services the clinics provide are reasonable and appropriate.  The State's regulation simply permits the insurer to keep money it would otherwise have to pay.  In these circumstances, the fraudulent incorporation theory fails to implicate a cognizable property right of the insurer under the mail fraud statute.  Rather, the right to withhold payment is a by-product of regulations designed exclusively to further the interests of the State.  Accordingly, the Court should preclude the government from obtaining mail fraud convictions based on the fraudulent incorporation theory.

In addition, Mr. Danilovich requests that the Court strike prejudicial surplusage from the Indictment, which includes vague references to unspecified crimes that are unrelated to the charged offenses.  Furthermore, Mr. Danilovich requests that the Court order the government provide him with law enforcement agents' contemporaneous notes of his post-arrest statements pursuant to Rule 16(a)(1)(B)(ii) of the Federal Rules of Criminal Procedure.

For all these reasons and the reasons set forth below, Mr. Danilovich's pretrial motions should be granted.

**PRETRIAL MOTIONS**

I. **THE MAIL FRAUD CHARGE BASED ON THE "FRAUDULENT INCORPORATION" THEORY SHOULD BE DISMISSED**

The Indictment fails to state a federal mail fraud offense under the fraudulent incorporation theory because the alleged object of the fraudulent scheme -- the right and obligation of insurers to deny payment of no-fault claims submitted by layperson-owned clinics -- is not a cognizable property interest under the mail fraud statute. Accordingly, the Court should strike the fraudulent incorporation theory from the indictment and preclude the jury from convicting defendants on that theory.[2]

The mail fraud statute is "limited in scope to the protection of property rights." *McNally v. United States*, 483 U.S. 350, 360 (1987). The essential elements of a mail fraud violation are: (i) a scheme to defraud; (ii) money or property; and (iii) use of the mails to further the scheme. 18 U.S.C. § 1341; *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004). The "money or property" element is concerned with the precise nature of that harm, and "requires that the harm be concrete." *United States v. Walker*, 191 F.3d 326, 335 (2d Cir. 1999). The victim of a mail fraud must have a valid property interest in the "money or property" to satisfy the "money or property" element. *See, e.g. Cleveland v. United States*, 531 U.S. 12, 26 (2000) ("Tellingly . . . the Government nowhere alleges that Cleveland defrauded the State of any money to which the state was entitled by law."); *Pasquantino v. United States*, 544 U.S. 349, 355 (2005).

---

[2] On a motion to dismiss, the court must treat the allegations in the indictment as true. *United States v. Velastegui*, 199 F.3d 590, 592 n.2 (2d Cir. 1999). "Dismissal is required where the conduct alleged in the indictment as a factual basis for the offense is not actually prohibited by the language of the statute." *United States v. Aleynikov*, 737 F. Supp. 2d 173, 176 (S.D.N.Y. 2006).

4

The Second Circuit has recognized, in certain circumstances, that a company's right to control its assets by making discretionary economic decisions based on truthful and accurate information constitutes "property" within the meaning of the mail fraud statute. *See, e.g.*, *United States v. DiNome*, 86 F.3d 277, 284 (2d Cir. 1996); *United States v. Carlo*, 507 F.3d 799, 802 (2d Cir. 2007). The alleged property interest at issue here is the purported right of the insurance companies to control their assets, and specifically, the right to deny reimbursement to layperson-owned medical clinics. See Indictment ¶ 5; Gov't Mem. Opp. to Bill of Particulars, 10-26-12 (Dkt. # 372) at 3 ("[T]he insurance companies *would not have paid* had they known the truth about who controlled the clinic, and the insurance companies were therefore defrauded on any claim for payment from those fraudulently incorporated medical clinics.") (emphasis added). No "right to control" on the part of insurers, however, was implicated by the alleged fraudulent scheme. Under New York's no-fault regulations, layperson-owned clinics are "*ineligible* for reimbursement." See 11 NYCRR 65-3.16 (a)(12) (emphasis added). Insurers, therefore, are not lawfully permitted to reimburse layperson-owned clinics. Because the insurers wholly lacked discretion as to whether to pay layperson-owned clinics, there was no deprivation of a "right to control" for the purposes of satisfying the "property" element of the mail fraud statute. *See United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994), *cert. denied*, 513 U.S. 1084 (1995) (A misrepresentation impairs the "right to control" where "the information withheld either [has] some independent value or . . . bear[s] on the ultimate value of the transaction."); *United States v. Turner*, 465 F.3d 667, 680 (6th Cir. 2006) (rejecting mail fraud charge based on campaign fraud as legally insufficient because the object of the alleged scheme, an elected

official's salary, did not implicate the State's discretionary right to control its assets: "the relevant salary would be paid to someone [whoever won the election] regardless of the fraud.").[3]

The regulations making layperson-owned clinics ineligible for no-fault reimbursement were promulgated for public policy purposes, specifically "to combat rapidly growing incidences of fraud in the no-fault regime . . . identified as correlative with the corporate practice of medicine by non-physicians." *State Farm Mut. Ins. Co. v. Mallela*, 4 N.Y.3d 313, 323, n.2 (2005).[4] Although that regulation confers a benefit on insurers by allowing them to keep money they would otherwise have to pay -- even for legitimate and necessary services rendered by licensed physicians – that benefit is designed solely to further the State's interests in deterring the unauthorized practice of medicine. Indeed, under the no-fault scheme, insurance carriers have substantial incentive to decline to reimburse layperson-owned clinics, and thus make the business of no-fault health services unattractive to laypersons. In essence, the New York State

---

[3] Even assuming the insurance companies have lawful discretion to pay layperson-owned clinics, but would choose not to reimburse them, to the extent the health care services were provided by licensed physicians and were reasonable and appropriate, there would still be no violation of the mail fraud statute. *See, e.g.*, *Mittelstaedt*, 31 F.3d at 1217 ("Lack of information that might have an impact on the decision *where* money is spent, *without more*, is not a tangible harm and therefore does not constitute a deprivation of section 1341 'property'") (emphasis added); *United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007) ("Our cases have drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would *otherwise avoid* -- which do not violate the mail or wire fraud statutes -- and schemes that depend for their completion on a misrepresentation of an essential element of the bargain -- which do violate the mail and wire fraud statutes").

[4] Based on past conduct of some layperson-owned medical services corporations, New York has implemented a policy that sweeps broadly to exclude even those layperson-controlled medical clinics that provide reliable and cost-efficient health care services to injured motorists. Many states have not imposed such wholesale restrictions on layperson-owned medical services corporations. *See, e.g.*, Nat'l Hospice and Palliative Care Organization, "Corporate Practice of Medicine Doctrine: 50 State Survey Summary" (Sept. 2006), *located at* http://www.nhpco.org/files/public/palliativecare/corporate-practice-of-medicine-50-state-summary.pdf.

Department of Insurance, through promulgating certain regulations, has made carriers its partners in enforcing the no-fault regulatory scheme in a cost-effective manner for the State. *Mallela*, 4 N.Y.3d at 321.  The incidental benefits to insurance carriers, however, are not property rights and were never recognized as such under the common law.  *See, e.g., United States v. Evans*, 844 F.2d 36, 41 (2d Cir. 1988) (whether an interest was considered "property" under common law is a relevant consideration as to whether it is "property" for the purposes of the federal mail fraud statute).  The non-discretionary right to keep and withhold funds claimed by non-layperson owned clinics for reimbursement is principally a regulatory interest of the State, and thus not a property right of the insurers.  *See, e.g.*, *Cleveland*, 531 U.S. at 21 (rejecting State's interest in licenses as cognizable under the mail fraud statute; licensing statute "establishes a typical regulatory program . . . long characterized by this Court as exercises of state police powers"); *Evans*, 844 F.2d at 41 (interests ancillary to regulation, as here, are outside the purview of the mail fraud statute); *United States v. Ferrara*, 709 F. Supp. 39 (E.D.N.Y. 1988) (holding that license to practice medicine issued by state authorities is not a property interest of the state for the purposes of the mail fraud statute).  Accordingly, whatever State regulations may have been violated by defendants' alleged conduct, the federal mail fraud statute was not.

The Supreme Court's opinion in *Cleveland* is instructive.  In *Cleveland*, the Court reversed defendants' convictions for mail fraud based on defendants' obtaining video poker licenses by submitting fraudulent applications.  *Cleveland*, 531 U.S. at 12.  The Court held that Louisiana's right to issue video poker licenses was not a cognizable property interest under the mail fraud statute:  "Whatever interests Louisiana might be said to have in its video poker licenses, the State's core concern is *regulatory*."  *Cleveland*, Id. at 20 (emphasis in original).  Louisiana's right to select video poker licensees "rests upon the State's sovereign right to

7

exclude applicants deemed unsuitable to run video poker operations. A right to exclude in that governing capacity is not one appropriately labeled property." 522 U.S. at 24. The same conclusion is warranted here with respect to the insurance companies' obligation to deny claims from fraudulently incorporated clinics. Although the insurance companies are not a government agency, their right to withhold is part and parcel of the regulatory scheme implemented by New York's Department of Insurance. Because the insurers' right to withhold payment stems exclusively from New York's comprehensive no-fault regulatory scheme, it is not a property right of the insurers.

The insurers' right to withhold payments from clinics also fails to satisfy the hallmark features of property: exclusivity and transferability. *See, e.g.*, *United States v. Henry*, 29 F.3d 112, 114 (3d Cir. 1994) (whether an interest was traditionally considered "property" is a relevant consideration as to whether it is a property interest cognizable under the mail fraud statute; affirming dismissal of mail fraud charge on ground that a "fair bidding opportunity" is not a traditional property right). Here, the insurance carriers' right to keep funds claimed by layperson-owned clinics lacks the element of exclusivity that is characteristic of traditional property rights. Layperson-owned clinics are excluded from reimbursement not to benefit insurers but to promote the public policy decisions of the New York Superintendent of Insurance in deterring the corporate practice of medicine. *See, e.g., Metroscan Imaging, O.C. v. Geico Ins. Co.*, 13 Misc.2d 35, 39 (N.Y. Civ. 2006).[5]  Nor is the right to deny reimbursement of layperson-

---

[5] The notion that prohibiting the corporate practice of medicine is good public policy is not universal. The Center for Medicare and Medicaid Services (formerly the "Health Care Financing Administration" ("HCFA")) has concluded that the participation of non-physicians in the ownership and management of medical service providers may enhance, rather than undermine, the ability of professional corporations to provide quality medical care. This conclusion was first set forth in a notice published by the Department of Health and Human Services discussing why new regulations

*(Footnote continued)*

owned clinics transferrable. So long as any insurance company participates in New York's no-fault program, it must deny claims submitted by layperson-owned clinics. The insurance company cannot transfer this right to an insurance company outside the no-fault system or a non-insurer within the no-fault system. Indeed, an insurance company cannot sell or assign or transfer its right to withhold payment to anyone. Accordingly, the insurance companies' right to withhold payment from layperson-owned clinics is not "property" within the meaning of the mail fraud statute. See, e.g., *United States v. Alkaabi*, 223 F. Supp. 2d 583, 590 (D.N.J. 2002) (ruling that because ETS's interest in "maintaining the integrity of the testing process" was neither exclusive nor transferrable, it was not a property interest under the mail fraud statute).

Finally, prudential concerns militate against permitting the government's fraudulent incorporation theory to be a basis for a mail fraud conviction. Mail fraud based on fraudulent incorporation would permit the federal government to prosecute conduct that traditionally has been regulated by New York's comprehensive no-fault scheme. As noted above, we have not found a single case in which a court upheld a mail fraud conviction based on the fraudulent incorporation theory. In the absence of a clear statement by Congress, the mail fraud statute should not be used as a mechanism to enforce state law regulations through the federal criminal justice system. See *Cleveland*, 531 U.S. at 25 ("[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance in the prosecution of crimes"); *Evans*, 844 F.2d at 41 (where the legislature has provided specific and elaborate regulatory provisions, "we will not lightly assume an unexpressed intent to create additional

---

promulgated by the HCFA permitted entities with corporate structures similar to PC Defendants to qualify as "group practices" under Section 1877 of the Social Security Act and, thus, share in profits from designated health services provided under the Medicare program. 66 Fed.Reg. 856 ( Jan. 4, 2001). HCFA noted that sometimes "management companies ... [or] for profit corporations ... form a 'captive' or 'friendly' professional corporation with one physician owner who holds the ownership rights to the professional corporation in trust for the corporation." *Id*. at 899.

9

ones"). Moreover, "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Cleveland*, 531 U.S. at 25; *see also, Evans*, 844 F.2d at 4.

Accordingly, the Court should preclude the government from pursuing its prosecution of the mail fraud charge based on the fraudulent incorporation theory.

## II. THE COURT SHOULD STRIKE PREJUDICIAL SURPLUSAGE FROM THE INDICTMENT

The Court has discretion to strike irrelevant, inflammatory and prejudicial surplusage from an indictment. *See* Fed. R. Crim. P. 7(d); *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990). A defendant may be prejudiced by such material where an indictment is provided or read to a jury. *See, e.g.*, *United Sates v. Trie*, 21 F. Supp. 2d 7, 19 (D.D.C. 1998). Where "language does not add anything to the charges in the indictment and would lead the jury to draw improper inferences regarding other crimes not charged in the indictment, it should be stricken." *United States v. Victor Teicher & Co., L.P.*, 726 F. Supp. 1424, 1441 (S.D.N.Y. 1989).

The Indictment here is littered with gratuitous statements suggesting that the defendants engaged in crimes and other wrongdoing unconnected to the crimes with which the defendants are charged. Specifically:

- The No-Fault Organization allegedly participated in "*organized criminal activities*," and its members and associates engaged in "*various crimes*," "*including*" "a scheme to defraud automobile insurance companies that provide health care benefits to accident victims," as well as "mail fraud," and "money laundering." (¶1) (emphasis added).

- The No-Fault Organization operated through two primary operating branches, both of which engaged in "criminal conduct *including*, *but not limited to*, mail fraud and money laundering." (¶14) (emphasis added).

- Mr. Danilovich and others "participated and profited from *various crimes*, *including* mail fraud and money laundering." (¶15) (emphasis added).

- Mr. Danilovich and others participated "in *various criminal activity including* mail fraud and money laundering." (¶18) (emphasis added).

- It "was *a part and an object* of the conspiracy . . ." (¶¶ 25, 28, 31, 32, 33) (emphasis added).

In similar circumstances, courts in the Second Circuit have stricken words such as "among others," and "among other things" which "serve no useful purpose and allow the jury to draw the inference that the defendant is accused of crimes not charged in the indictment." *United States v. DeFabritus*, 605 F. Supp. 1538, 1547 (S.D.N.Y. 1985).  Indeed, a "broad allegation such as 'and other activities' when contained therein adds nothing to the charges, gives the defendant no further information with respect to them, and creates the danger that the prosecutor at trial may impermissibly enlarge the charges contained in the Indictment returned by the grand jury."  *United States v. DePalma*, 461 F. Supp. 779, 798-799 (S.D.N.Y. 1978).  The same rationale applies here with equal force.

Accordingly, the Court should strike the surplusage identified above from the Indictment.

### III. THE GOVERNMENT SHOULD PRODUCE CONTEMPORANEOUS NOTES OF MICHAEL DANILOVICH'S POST-ARREST STATEMENTS

The government has provided Michael Danilovich with a typed report purporting to summarize the substance of his post-arrest statements to law enforcement.  However, it has not responded to Mr. Danilovich's request under Rule 16 for all contemporaneous notes made by law enforcement.  Rule 16 requires the production of "*any* written record containing the substance of any relevant oral statement made before or after arrest if the defendant made the statement in response to interrogation by a person the defendant knew was a government agent." Fed. R. Crim. P. 16(a)(1)(B)(ii) (emphasis added).  Judge Kaplan has held that the plain language of the Rule and its commentary require the production of agent's rough notes of statements to law enforcement.  *See United States v. Stein*, 424 F. Supp. 2d 720, 728-729 (S.D.N.Y. 2006).

*See also*, *United States v. Ionia Mgt. S.A.*, 2007 WL 2298570, at *2 (D. Conn. Aug. 3, 2007) (same); *United States v. Ferguson*, 478 F. Supp. 2d 220, 237 (D. Conn. 2007).

Accordingly, the Court should order the government to produce to Mr. Danilovich the contemporaneous notes taken by law enforcement agents of his post-arrest statements.

## CONCLUSION

For all of the foregoing reasons, the Court should grant Michael Danilovich's pretrial motions to dismiss, to strike surplusage, and for Rule 16 discovery.

January 18, 2013  /S/ Eric M. Creizman\_\_\_\_\_
New York, New York  Eric M. Creizman (EC 7684)

        CREIZMAN PLLC
        565 Fifth Avenue, Fl. 7
        New York, New York 10017
        Tel.: (212) 972-0200
        Fax: (646) 200-5022
        Email: ecreiz@creizmanllc.com

        *Attorneys for Michael Danilovich*