DAi5zem1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        12-CR-171 (JPO)

 5   MIKHAIL ZEMLYANSKY, MICHAEL
     DANILOVICH, TATYANA
 6   GABINSKAYA, JOSEPH VITOULIS,
     BILLY GERIS,
 7
                Defendants.              Jury Trial
 8
     ------------------------------x
 9
                                         New York, N.Y.
10                                       October 18, 2013

11                                       4:10 p.m.

12
     Before:
13
                       HON. J. PAUL OETKEN,
14
                                         District Judge
15

16                       APPEARANCES

17   PREET BHARARA
          United States Attorney for the
18        Southern District of New York
     EDWARD Y.K. KIM
19   PETER M. SKINNER
     DANIEL S. NOBLE
20        Assistant United States Attorneys
     COLLEEN GEIER, Paralegal Specialist
21
     FISCHETTI & MALGIERI, LLP
22        Attorneys for Defendant Mikhail Zemlyansky
     BY:  RONALD P. FISCHETTI, ESQ.
23        PHYLLIS ANN MALGIERI, ESQ.

24   LAW OFFICE OF ERIC FRANZ, PLLC
          Attorneys for Defendant Mikhail Zemlyansky
25   BY:  ANDREW MANCILLA, ESQ.
```

DAi5zem1

```
                              APPEARANCES
                              (Continued)

CREIZMAN PLLC
     Attorneys for Defendant Michael Danilovich
BY:  ERIC M. CREIZMAN, ESQ.
     KAITLIN DABBERT

GLENN A. GARBER, P.C.
     Attorneys for Defendant Billy Geris
BY:  GLENN A. GARBER, ESQ.
     G. HANNA ANTONSSON, ESQ.

ARTHUR GERSHFELD, PLLC
     Attorneys for Defendant Tatyana Gabinskaya
BY:  ARTHUR GERSHFELD, ESQ.

LAW OFFICE OF STANISLAO A. GERMAN
     Attorneys for Defendant Joseph Vitoulis
BY:  STANISLAO A. GERMAN, ESQ.

MYERS SINGER & GALIARDO LLP
     Attorneys for Defendant Joseph Vitoulis
BY:  MATTHEW D. MYERS, ESQ.

ALSO PRESENT:  DONALD ANSPACHER, FBI
               MICHAEL KELLEY, FBI
```

DAi5zem1

```
 1                    (Trial resumed; Jury not present)
 2              THE COURT:  All right.  We are here for charge
 3    conference and you all received the draft from yesterday,
 4    right?
 5              MR. SKINNER:  Yes, your Honor.
 6              THE COURT:  And I have received a letter from the
 7    government and a letter from Mr. Creizman on the fundamental
 8    ambiguity language.  I don't know how you all want to do it, if
 9    you want to go section by section or page by page.  I am open
10    to whatever you think is the most efficient.
11              MR. FISCHETTI:  Your Honor, we have gone over this,
12    there is very few suggestions we would have so I would think
13    for economy of time, if your Honor would just ask what we
14    object to, what we would like to change, it would be easier
15    than going page by page.
16              THE COURT:  That's fine.
17              MR. SKINNER:  Look.  I want to get this done as
18    efficiently as possible too.  Maybe if we say -- I do think it
19    makes sense to go in order so we don't miss something through.
20    Why don't we say our first proposed change is on page 18.  Does
21    the defense have anything before that?
22              MR. GARBER:  No.
23              MR. FISCHETTI:  Not from me.
24              THE COURT:  If you want, you can be seated during
25    this, as long as you are speaking into the microphone.
```

DAi5zem1                        Charge Conference

1              MR. SKINNER:  Thank you, your Honor.

2              On page 18 our only suggested revision, and it tracks

3     through to three paragraphs of the immunity, is removing the

4     language with respect to non-prosecution because we actually

5     did not have any witnesses who received a non-prosecution

6     agreement.

7              So, for instance, in the first sentence delete

8     everything after, "formal immunity," to the end of the

9     sentence.

10             MR. GERMAN:  Well, and in the next sentence, rather

11    than saying with respect to both categories of witnesses,

12    delete that phrase and just start with, "The testimony of these

13    witnesses may not be used against him or her."

14             THE COURT:  So, the non-prosecution language doesn't

15    cover the cooperation agreements?

16             MR. SKINNER:  No.  We have a separate charge that

17    precedes this with respect to cooperating witnesses.  The

18    non-prosecution agreement is something different.

19             THE COURT:  Right.

20             MR. SKINNER:  And it is akin to a cooperation

21    agreement but it is not the same and --

22             THE COURT:  We didn't have any.

23             MR. SKINNER:  There were no witnesses that testified

24    pursuant to a non-pros.

25             THE COURT:  Is there any objection after the

1  parenthetical that is called "Formal Immunity" taking out of

2  the rest of the sentence.  Is that right?

3          MR. SKINNER:  Precisely, your Honor.  So, just delete

4  the rest of that sentence; in the next sentence then delete,

5  "with respect to both categories of witnesses."

6          MR. GARBER:  So, it would be deleted from the word --

7  well, formal immunity, end paren, comma, from or all the way

8  down to the end of that sentence is out?

9          MR. SKINNER:  Yes.

10          MR. GARBER:  Okay.

11          THE COURT:  And then we take out with respect to both

12  categories of witnesses and start with, "the testimony."

13          MR. SKINNER:  And change "the" to "these witnesses."

14          MR. GERMAN:  Your Honor, I would just ask then where

15  does the -- although they weren't testifying witnesses,

16  certainly Mr. Sukhman's father and wife, although they didn't

17  testify there was certainly an acknowledgment that they would

18  not be prosecuted for Mr. Sukhman's cooperation.  So, I mean,

19  maybe we just need to rephrase that but I think we have to

20  capture the fact that --

21          MR. SKINNER:  No.  That's not right.  I'm sorry.  We

22  are talking here about what should be done with respect to

23  witnesses who testified in the case and the analysis the jury

24  should give to their testimony.  Mr. Sukhman's father and wife

25  did not receive non-prosecution agreements first.  Second of

DAi5zem1                    Charge Conference

1    all, they didn't testify.

2          Defense can make whatever arguments they want to make

3    about Mr. Sukhman's credibility and how it was influenced by

4    promises that he testified to but it has nothing do with this

5    instruction.

6          THE COURT:  Okay.

7          MR. SKINNER:  In the first paragraph on page 19, then,

8    just delete the second sentence in its entirety.

9          MR. CREIZMAN:  I'm sorry.  I could not hear that.

10         MR. SKINNER:  The first paragraph of page 19, delete

11   the second sentence starting with, "similarly, the government

12   is permitted to enter into non-prosecution agreements."

13         THE COURT:  Wait.  You're on page 19?

14         MR. SKINNER:  According to my version, yes, your

15   Honor.

16         THE COURT:  I'm sorry, yes.  "Similarly," yes.

17         MR. SKINNER:  And then the next paragraph after that,

18   the first sentence just have, "However, the testimony of a

19   witness who has been granted immunity by the Court," delete "or

20   who have been given a written non-prosecution agreement by the

21   government," and then go right to, "should be examined by you

22   with great care."

23         THE COURT:  Okay.  Anything else on 19?  What is your

24   next?

25         MR. SKINNER:  Your Honor, the government's next

DAi5zem1                          Charge Conference

1    comment would be on page 28.  I don't know if the defendants

2    have anything before that.

3              MR. GARBER:  Okay.  We have stuff, I believe, before

4    that.  I apologize, no, we don't.  We're 29.

5              MR. SKINNER:  Okay.  On 28, your Honor, with respect

6    to the RICO charge in the -- I guess I don't know how to

7    describe it, the one, two, three, four, five, six -- seventh

8    line up from the bottom?

9              THE COURT:  This is on 28?

10             MR. SKINNER:  On page 28, yes; it says this is a

11   complex charge."  We would suggest just deleting, "this is a

12   complex charge," and just have you say I will explain the law

13   of racketeering later.  We don't think we need to characterize

14   any particular statutes as complex or not complex for the jury.

15             THE COURT:  That's fine.

16             MR. GERMAN:  I'm sorry.  Can you just bring the

17   microphone closer?  You are fading out.

18             MR. GERSHFELD:  Judge, can I interrupt for a second?

19   I did miss a comment on 26.

20             THE COURT:  Okay.

21             MR. GERSHFELD:  Second paragraph, it states, "The

22   defendant begins trial with an absolutely clean slate and

23   without any evidence against him."  It should probably state

24   "her," considering I only have the one female in the bunch.

25             MR. GERMAN:  Him or.

DAi5zem1                         Charge Conference

1          THE COURT:  Him or her.

2          MR. GERSHFELD:  Him or her, yes.

3          THE COURT:  Thank you.  All right.

4          MR. SKINNER:  I think Mr. Garber has a comment on page

5     29?

6          MR. GARBER:  On page 29, this is crimes defined by

7     criminal statutes only and it would be the fourth line down

8     from the beginning of that section starting with, "some vague

9     feeling."  I would say some belief or vague feeling that

10    something wrong has been done is insufficient to convict anyone

11    of any charge whatsoever.

12         MR. SKINNER:  Your Honor, I actually think a belief

13    and a vague feeling are two very different things and a belief

14    is a much stronger conviction that something wrong has been

15    done.  I don't -- we would object to changing that.

16         MR. GARBER:  I just think vague feeling is too, like,

17    watered down and too complicated for them to understand.  You

18    are talking about nuance, really, which I like.  I think a

19    nuance feeling but also you should say belief, too; belief or

20    vague feeling.

21         MR. CREIZMAN:  If we put quotes around "something

22    wrong" and if we added "belief" it would seem to convey the

23    message of that you're trying to -- that Mr. Garber is trying

24    to address and it would also address the government's concern

25    about specific crimes.

1          THE COURT:  But the quotes won't be -- when I read it

2     the quotes won't come out unless I do air quotes.

3          MR. CREIZMAN:  If your Honor could do that, that would

4     be great.  You could say the so-called defendants.

5          MR. FISCHETTI:  Judge, I don't know if this solves the

6     problem for Glenn or the government but how about considering

7     just taking out the word, "some feeling?"

8          THE COURT:  How about some feeling?

9          MR. SKINNER:  Fine, your Honor.

10         THE COURT:  Some feeling.

11         MR. FISCHETTI:  I think that solves the problem,

12    Judge.

13         THE COURT:  It is a happy medium.

14         MR. GARBER:  Okay.  Also on 29, the second paragraph

15    under the C Section, the crimes defined section:  You have

16    heard testimony that New York State requires professional

17    corporations...  And it goes on I think in addition, this is

18    talking about fraudulent corporation and the regulation.  Now,

19    at the end of that paragraph I think this language should be in

20    there as well:  You also heard testimony about runners and

21    kickbacks also referred to as referral fees.  Should you find

22    that this conduct occurred, it does not, in and of itself,

23    constitute a violation of the criminal law.

24         MR. SKINNER:  We object to that.

25         MR. GARBER:  Because we are really talking about a

1    series of violations here and there was a lot of testimony

2    about -- well, there is testimony about Stark laws, testimony

3    about kickbacks not in and of themselves being criminal in

4    nature, testimony about runners, and I even think Dillon -- I

5    am forgetting their witness, their witness from one of the

6    insurance companies -- acknowledged during his testimony that

7    the use of runners is not in and of itself even a violation of

8    civil law.  So, I just think that this is an appropriate place

9    for that language.  It mirrors the language you are using for

10   fraudulent incorporation and I just think it should be in

11   there.

12            MR. GERMAN:  Judge, I think the Court can take

13   judicial notice of the anti-kickback scheme as it relates to

14   medical professionals, the Stark laws, it is a civil violation

15   of law, and so I know there has been some -- it has been

16   confusing because we have had some witnesses who have said I

17   don't believe it is criminal and then we had Mr. Debiasi in the

18   morning who said I didn't think so, but then in the afternoon

19   he said he did think so.

20            It clearly isn't.  We all know what the Stark laws are

21   and that ambiguity to the jury should be cleaned up.

22            MR. SKINNER:  Your Honor, we are going to be arguing

23   to this jury that kickbacks alone are sufficient to prove

24   criminal liability in this case because kickbacks are a

25   motivation for somebody to make a referral that is non-medical

1    and is motivated by finances instead.  So, I don't think that

2    there is any reason to be including any qualification on what a

3    kickback might show because certainly a kickback alone may be

4    sufficient proof for this jury to determine that there is a

5    violation of criminal law.

6            THE COURT:  How could a kickback alone establish a

7    violation of, say, health care fraud?

8            MR. SKINNER:  Fair enough.  It would have to be

9    coupled with an actual bill to an insurance company but the

10   argument would be that evidence of kickbacks and evidence of

11   bills -- and there is no dispute there is plenty of evidence of

12   bills here -- but the evidence of kickbacks by themselves, of

13   course we are going to have other arguments about why fraud was

14   committed.  But, we will be saying to the jury the kickbacks

15   themselves, whether or not they were included within the amount

16   billed to the insurance company, are evidence that the

17   individuals who are making the referrals were motivated by

18   something other than medical necessity, they were motivated to

19   make referrals to get to kickbacks.  So, that's why the

20   kickbacks, by themselves, could be evidence of the intent to

21   commit fraud.

22           MR. CREIZMAN:  I think the inference is fair except

23   for the point of themselves.  I think that you're asking the

24   jury to draw an inference that kickbacks, you know, the reason

25   why this is -- that they're about medical necessity, I think

1    certain treatments weren't medically necessary, you were doing

2    the treatment so you can basically churn fees and that and

3    kickbacks -- kickbacks -- was the motivation but in themselves

4    not proof of fraud.  In themselves is not itself a crime.  The

5    kickback itself is not a crime.

6              MR. GARBER:  Two things:  One is whether or not we

7    should put this language in which, by the way, sounds

8    consistent with what the government said at the tail end

9    there --

10             MR. SKINNER:  Well --

11             MR. GARBER:  If I could speak?  Okay; that the

12   kickbacks are evidence essentially when coupled with other

13   things that a fraud took place.  I think that's what

14   Mr. Skinner is saying is the second part of his discussion

15   there.  They should be precluded by saying kickbacks in and of

16   themselves establish a fraud or even imply that because that is

17   wrong.  But, going back to my application to add this language.

18   I think it is very clear that when you're talking about civil

19   wrongs that there should be mention of kickbacks and runners

20   because that was front and center in this trial and it is

21   certainly on similar ground to this fraudulent incorporation

22   stuff and to not put it in there I think is inappropriate given

23   the full field of information and the significance of runners

24   and kickbacks.

25             MR. CREIZMAN:  And that's important, too, because

1    first of all I opened on the point.

2          MR. SKINNER:  Can I interrupt?  Because I think maybe

3    I can cut some of this short.

4          Upon further reflection, I had not been thinking of

5    kickbacks as a violation of the Stark laws but if you think of

6    fee splitting as a kickback, that would be a violation of the

7    Stark laws.  So, I don't disagree with what Mr. Garber is

8    saying, that New York Law also prohibits fee splitting.  There

9    is no language about kickbacks in the Stark laws so I think if

10   we couch this as:  You have heard testimony that New York

11   requires professional corporations... I think right after that

12   sentence you can say:  You have also heard testimony about fee

13   splitting which is also prohibited by New York State law.  And

14   we would agree that both things, on their own, are civil

15   violations and not criminal violations.

16         MR. GERMAN:  Stark laws are a federal violation, it is

17   not a state violation.  And I believe the name of the statute

18   is actually the anti-kickback statute.  I think it is commonly

19   referred to as the Stark laws.

20         MR. CREIZMAN:  Not even talking about the Stark laws

21   the very act of kickbacks or referrals point is itself the

22   point.

23         MR. GARBER:  I would agree with that.  We should use

24   the language that the jury knows.  Stark laws got thrown out

25   there but they were never explained.  What was thrown out there

 1    repeatedly was the term kickback, the term runners, and also

 2    fee splitting.  So, I think that we could add fee splitting in

 3    there too and I think the language should be you have heard

 4    testimony about runners, fee splitting and kickbacks also known

 5    as referrals, because I think it is fair to characterize

 6    kickbacks in a defense way also in that discussion.  If you

 7    find that this conduct occurred, that conduct, in and of itself

 8    which is the same language you are using for fraudulent

 9    incorporation is not, I think you say a violation of the

10    criminal law.  That is an accurate statement, it deals with the

11    language that the jury knows here, and that's how I think it

12    should be phrased in this section of the charge.

13           MR. SKINNER:  I know the Board of Regents New York

14    prohibits fee splitting.  What civil statute expressly

15    addresses referral fees or kickbacks?  Because if there isn't

16    one, then there is no need to have it categorized here in a

17    discussion of what might be a civil violation.

18           MR. GARBER:  Fee splitting and kickbacks are the same

19    thing.  So, if Michelle Glick, for example, is giving them

20    money back out of reimbursements that you call kickbacks that

21    are cashed, okay, that's a fee splitting arrangement and it

22    compromises her integrity as a professional which is why the

23    mini-Stark laws, which is the New York version of the Stark

24    laws, address that.

25           MR. FISCHETTI:  I'm lost, Judge.  I'm sorry.  I'm

1    lost.

2              I mean, I don't know why we have to go into detail

3    about referral fees or kickbacks may possibly be a violation of

4    the Stark laws or something civil.  I don't understand we have

5    to do that.  I mean, I think in my summation to some extent

6    based upon the fact that referral fees or kickbacks as it is

7    called here, unless it shows that the insurance company had to

8    pay a greater fee are not in and of themselves criminal.  And I

9    think that's an accurate statement of the law and I don't know

10   why we have to get into civil law, Stark laws, or anything like

11   that.  I think that's a fair statement.  The fact that you may

12   have heard -- and I'm not talking about how you write it and I

13   will leave that to people who are more intelligent than I am --

14   but the fact that you have heard testimony about kickbacks or

15   referral fees or fee splitting, those things, or whatever you

16   want to call them, are not, in and of themselves, a violation

17   of criminal law.  Of course Mr. Skinner can certainly argue

18   that you have to consider that they are an integral part of the

19   crime we are charging here because you have to do various

20   things, you get more business that way or something like that.

21   We're not barring him from doing that.  But, in and of itself

22   if someone gets an MRI and it costs $1,000 and a clinic who

23   refers the MRI gets $200 back but the clinic itself is paid

24   $1,000 that, in and of itself, those facts, are not a violation

25   of the criminal law.

1              THE COURT:  Are both kickbacks and use of runners

2      violations of civil law?  Or is it just kickbacks?

3              MR. GARBER:  My understanding, okay, is that fee

4      splitting and kickbacks is a subset of fee splitting and

5      runners are -- well, putting runners aside I think kickbacks is

6      a subset of fee splitting and it is a violation of Board of

7      Regent regulations which is designed to maintain the integrity

8      of professionals because they don't want them fee splitting so

9      that a doctor is doing services -- compromising their medical

10     decision-making.

11             THE COURT:  What about something like you have also

12     heard testimony about runners and about kickbacks also known as

13     referral fees or fee splitting.  If you find such activity

14     occurred, that conduct alone, by itself, is not a violation of

15     the criminal law.  However, such activity may be evidence,

16     evidence that helps you to determine whether the defendants are

17     guilty of the crimes charged in the indictment.

18             MR. SKINNER:  We won't have a problem with an

19     instruction that had both sides that made clear that it was

20     evidence that could be considered.  I think stepping back

21     really the problem that the government has with this kind of

22     instruction is in every crime and every trial there is going to

23     be things that standing by themselves are innocuous or are not

24     themselves violations of a criminal statute, but when you

25     couple otherwise innocent acts together with intent you have

1    the crime.  And we don't usually, in instructing a jury, give

2    them a laundry list of things that we may have heard about

3    that, by themselves, are not crimes.  We just tell them what

4    the crime is and then we all make our arguments according to

5    the facts that came in.

6          So, we may pick three things now and by the end of the

7    weekend and when everybody has read the transcript we may come

8    back Monday morning with 10 more facts that these guys want to

9    now say, by themselves, that's not a crime.

10          What is the point of it?

11          MR. GARBER:  Because these were things that were

12    thrown out there that are relevant to -- they're part of this

13    trial.

14          Can I ask the Court a question?  If you do go our way

15    on this is that what you are contemplating, that added

16    language, you know, the can be considered in your consideration

17    essentially of whether or not a crime was committed, that

18    clause at the end?  Because I want to confer with co-counsel on

19    this and we may decide to withdraw our application.

20          THE COURT:  Yeah.  I think if I put it in I would want

21    to put in something about like the latter part.

22          MR. GARBER:  Can I talk?

23          (Counsel conferring)

24          MR. FISCHETTI:  I think the instruction is fair,

25    Judge, but it would be fairer to the jury if you said taken

DAi5zem1                        Charge Conference

 1    together with other evidence may be a crime.  We are not

 2    arguing that the government can't argue that kickbacks,

 3    together with A, B, C and D, can show criminal conduct.  Our

 4    argument is that if there is just a kickback with no other

 5    evidence, that's not a federal crime and that is an accurate

 6    statement of law.

 7            THE COURT:  Would the government be okay with

 8    something like that?

 9            MR. SKINNER:  I think we can live with it.  I stand by

10    my general observation/objection that we don't typically

11    delineate for a jury what facts, on their own, are not

12    criminal.  But, you know, this is a case where there has been

13    testimony, at least with respect to the incorporation issue,

14    that things violate New York State law.  I don't know if we

15    have had any testimony or evidence with respect to the other

16    issues like kickbacks and things like that.

17            THE COURT:  It is one of these things where there was

18    a lot of testimony about runners and kickbacks and even kind of

19    hiding the use of runners and kickbacks in such a way that

20    might give rise to an inference that that, itself, was criminal

21    given the extent of the discussion of it during the course of

22    the trial.  We can wait and see if the jury asks a question

23    about it but it does seem like -- it is the kind of thing that

24    someone might think is criminal just based on sitting through

25    the trial.

1          MR. SKINNER:  But I think if it is -- if the Court

2     makes clear that these things can be considered as evidence of

3     the crime even though the mere payment of a referral fee would

4     not be a crime, then I think we can live with that.  I mean,

5     look.  This is a key part of our case, is arguing that these

6     very things are evidence of the crime and the fact that they

7     were hidden and the fact that nobody wanted anybody to know

8     about it and the fact that they took steps to conceal the

9     payments to the runners and things like that, that's evidence

10    that what they were doing was criminal and we don't want the

11    jury to think, oh, just because it is not, the Judge told us

12    that's not itself evidence of a crime because I don't think

13    that's right.  It is circumstantial evidence of what was

14    happening here and in any fraud case we are going to have to

15    rely upon circumstantial evidence to prove intent.  So, I don't

16    want us to raise our burden of proof here in trying to address

17    the unique facts of this trial.

18          MR. FISCHETTI:  I think the last thing you said, your

19    Honor, covers --

20          MR. GERMAN:  I think so.

21          MR. FISCHETTI:   -- both of our suggestions with

22    regard to that portion of the charge, quite frankly.

23          (Continued on next page)

24

25

Dai1zem2

1          MR. GARBER:  Taken together with other evidence.  It

2     was your language, but I believe that's --

3          THE COURT:  Yeah, we can do something like, "You've

4     also heard testimony about runners and kickbacks, also known as

5     referral fees or fee splitting.  If you find that such activity

6     occurred, that conduct by itself is not a violation of the

7     criminal laws that defendants are charged with violating.

8     However, such activity, together with other evidence, may help

9     you determine whether or not the defendants are guilty of the

10    crimes charged in the indictment."

11         MR. GERMAN:  That's absolutely acceptable to the

12    defense.

13         MR. FISCHETTI:  That's fair to us, your Honor.

14         MR. SKINNER:  That's fine, your Honor.

15         THE COURT:  I thought you were going to hear them say

16    yes and you were going to say no.

17         MR. SKINNER:  Try to be reasonable where we can.

18         THE COURT:  Okay.  Anything else on that section?

19         MR. SKINNER:  One kind of general comment, your Honor,

20    and I see it does come up here a few places throughout the

21    charge, and we might just need to do a search to find them all.

22    You referred to professional corporations controlled by

23    licensed physicians.  There's also evidence about professional

24    corporations in this case that were controlled by medical

25    professionals who were not physicians -- chiropractors,

Dai1zem2

1    physical therapists --

2              THE COURT:  Right.

3              MR. SKINNER:  -- so I think --

4              THE COURT:  Licensed healthcare professionals.

5              MR. SKINNER:  Yes, or in different places you called

6    them medical practitioners.  Medical professional, whatever you

7    want to call them is fine by us, so long as it's broader than

8    just physicians.

9              THE COURT:  Okay.

10             MR. GERMAN:  How is licensed healthcare professionals?

11             MR. SKINNER:  That's fine.

12             MR. GERMAN:  Okay.

13             THE COURT:  Licensed healthcare professionals.

14             Okay.  Section D, Healthcare Fraud.  Page.

15             MR. CREIZMAN:  Page 33, perhaps?

16             MR. GARBER:  I have some issues on page 32.

17             THE COURT:  Oh, okay.

18             MR. GARBER:  Can I go?

19             THE COURT:  Yes.

20             MR. GARBER:  Okay.  Page 32, where you start with, "It

21   is sufficient," this is the fourth paragraph down, "if the

22   prosecution proves."  I dislike this language because it tends

23   to, I think, lower their burden.  I mean, this whole section

24   kind of says like there's many ways that these defendants can

25   get convicted, but that's -- which I understand, okay, in

Dai1zem2

```
1    principle, but to highlight it too much I think is problematic
2    because it tends to lower the burden of proof.  So instead of
3    saying it is sufficient, I would just say the prosecution --
4    you've already given, you know, the setup in the prior
5    paragraph, and I think it should just say, "The prosecution
6    must prove beyond a reasonable doubt," and that's how that
7    sentence should be worded.  As opposed to saying it is
8    sufficient.  Sounds like, you know, a breeze.
9              MR. SKINNER:  Of course it is sufficient if we prove
10   beyond a reasonable doubt that one of them were made, but I
11   don't know if it changes the meaning of the sentence to say,
12   "If the prosecution proves beyond a reasonable doubt."  Well, I
13   guess it would.  I'm sorry.  Mr. Garber, can you just explain
14   exactly what you want the change to be.
15             MR. GARBER:  Take out the words "It is sufficient if"
16   and just start, "The prosecution must prove beyond a reasonable
17   doubt," so the change would be "It is sufficient if" out and
18   "proves" is changed to "must prove."
19             MR. SKINNER:  Your Honor, we don't have an objection.
20             MR. GERMAN:  That's pretty universally used, that
21   "must prove" language.
22             THE COURT:  "The prosecution must prove."  Okay.
23   That's fine.
24             MR. GARBER:  Now does this provoke a *Mallela*
25   discussion right now, this section, or --
```

Dai1zem2

1          THE COURT:  Oh, you wanted to talk about that?

2          MR. GARBER:  Or do -- because I think that's where

3     we're at right now.

4          MR. CREIZMAN:  Yes, I think page 33 is where it's at.

5          MR. GARBER:  Judge, we're in the lead-up to this and

6     then I think page 33 is where it gets hammered home, but --

7          MR. CREIZMAN:  Before we begin, if I may, your Honor,

8     I think I already said that reiterated our position for the

9     earlier -- for jury instructions that ownership of shares of a

10    corporation is ownership and that's -- but so I'm just

11    reiterating that again.

12         THE COURT:  Yes.

13         MR. CREIZMAN:  But that's all.

14         THE COURT:  Yes.

15         MR. MYERS:  Judge, can I just add, at the very bottom

16    of page 32, before we get to 33, the language of the last four

17    words there, "more serious and expensive," I ask that there be

18    some kind of language that infers that it has to be with

19    criminal intent or was purposeful.

20         THE COURT:  Wait.  What was that again?  Which

21    paragraph?

22         MR. MYERS:  The very last four words on the bottom of

23    page 32.  "More serious and expensive" is a bit ambiguous.  It

24    really has to be with purpose or intent that it was criminal,

25    not just accidental, negligent, things like that.  I mean, a

Dai1zem2

more expensive or more --

    MR. GERMAN:  Judge, just -- I mean, this whole section at the bottom here, I mean, we have this kind of litany of, you know, well, it could have been never provided, it could have been more serious and expensive, which kind of puts the jury in this weird place of having to determine what's more expensive, what's less expensive, and then it gets to and/or unnecessary and excessive because the patients did not medically need the treatments.  I mean, in the indictment, in the "to wit" language, the government says, you know, fraudulent incorporation with -- I believe it's with the intent to engage in unnecessary and excessive treatments.  I mean, I think we can just kind of lump that all into one.  If it's unnecessary, unnecessary could have been that it wasn't performed, that it wasn't necessary, medically necessary, and it could have been excessive if they were just continuing to bill.  So I just think the unnecessary and excessive language really covers everything else, and that really comes right out of the indictment.

    THE COURT:  Well, actually, these three phrases I think were in the indictment.

    MR. SKINNER:  I was going to say, there's a lot of language in the indictment we'd be happy to include in the charge.

    THE COURT:  Well, I mean, the other thing is, this is

Dai1zem2

```
1    not the purpose prong.  This is just the first element.  And
2    it's characterizing the billing theory as opposed to the
3    ownership theory.
4              MR. GERMAN:  No, no, I understand that, but I mean --
5    I mean, more serious and expensive --
6              MR. GARBER:  Well, there's another problem with that,
7    and I would move to strike that, by the way, that second
8    clause.  There was I think some suggestion by the government
9    that they did -- they were trying to make money out of billing
10   for services that were unnecessary, but they didn't provide
11   proof, like here is a NF3 that shows what the correct one was
12   and this is the -- what the higher charge was, so this concept
13   of expensive was never borne out in their proof.
14             THE COURT:  What about the upcoding to, you know, a
15   higher degree with correspondingly higher claim?  Isn't that
16   more serious and expensive?
17             MR. SKINNER:  That was our expert testimony.
18             MR. GARBER:  I mean, it didn't come up in money
19   differences.  I mean, they just said that they were upcoding.
20             MR. GERMAN:  Judge, I mean, I think the issue is the
21   amount billed corresponds to the code.  I think this really
22   gives an impression that somehow they coded a 99 -- I forgot
23   these codes already, it's only been a day -- 205 and that, you
24   know, the cap was $155.30 and they were billing at $325, and
25   so, I mean, there's consistency in the code used and the
```

Dai1zem2

1    appropriate amount billed, and so this issue of expensive

2    really -- it's confusing to me.

3            MR. SKINNER:  Well, your Honor, I mean, it's really

4    not that confusing because we've argued that initial treatments

5    were billed at 99205s, they should have been billed at 99203s,

6    and there's been testimony that the 99205 is more expensive

7    than a 99203, and that's also borne out by the records in, you

8    know -- that are in evidence that show the amounts billed for

9    the 99205 and the 99203.  I -- I'm not entirely sure what the

10   objection is to the language.  It's plain language and it

11   describes exactly what we're claiming is wrong.

12           MR. GARBER:  Let me go a different way on this,

13   because I think Mr. Skinner's actually right, I think, on the

14   evidence that came out, by the way, okay?  But so -- but I

15   don't understand intellectually why -- how excessive, okay --

16   how more -- how more serious and expensive is different than

17   excessive.

18           MR. GERMAN:  That's my point.

19           MR. GARBER:  And if it is, you know, there's no

20   intellectual difference between those two concepts.  By adding

21   a different category in there, you're essentially giving the

22   jury this kind of vague other ground to potentially convict the

23   defendants on and it becomes a, you know, a expansion of the

24   indictment, and also, it tampers I think with the reasonable

25   doubt, the burden of proof and reasonable doubt.

Dai1zem2

1          MR. GERMAN:  Judge, I think that's my point.  I think

2     excessive incorporates what the court is trying to convey in

3     subsection 2.

4          THE COURT:  I think they're different concepts,

5     though.  Excessive is, I think, you did the treatment when they

6     didn't medically need it.

7          MR. SKINNER:  Exactly, your Honor.

8          THE COURT:  Where more serious and expensive than the

9     actual treatments they got is, you upcoded or you charged for

10     something more expensive than the thing actually provided.

11          MR. GARBER:  Why isn't that excessive, though, that

12     you're exceeding?

13          THE COURT:  In one you're exceeding the actual

14     treatment, and in the other you're exceeding the medical need.

15     You know what I mean?

16          MR. SKINNER:  In one the treatment wasn't necessary in

17     the first place and in one you charged -- you did treat but you

18     charged more than what's warranted.

19          MR. GERMAN:  Judge, how about something along the

20     lines of, "and second, the government alleges that the

21     defendants submitted or caused to be submitted fraudulent

22     insurance claims for medical treatments that were either not

23     provided or unnecessary or excessively billed."

24          MR. SKINNER:  Your Honor, the language is taken

25     directly out of the indictment.  It's in paragraph 4 of the

Dai1zem2

 1    indictment.  It's the allegations we've made.  They're going to

 2    have the -- I'm presuming that they're going to have the

 3    indictment with them when we send it back.  So I don't really

 4    see any need to change this because it's exactly what they're

 5    going to have in another document in any event.

 6          MR. GARBER:  Well, if we're right that excessiveness

 7    incorporates this other concept, then that -- the indictment

 8    doesn't control.  What controls is fairness.  And you can -- we

 9    don't control the indictment.  You can draft whatever

10    indictment you want.  And there was a surplusage argument that

11    was made in the beginning here, before the trial started.  If

12    the indictment is going to be given to the jury, there's

13    language about user friendly -- I think that that should be

14    taken out, by the way, but --

15          MR. SKINNER:  Well, I guess we can -- your Honor, we

16    stand by the arguments that we've been trying to articulate --

17    I think the court articulated them better than we have -- that

18    we view these as being two different types of

19    misrepresentation.  Excessive is not the same as more

20    expensive.

21          THE COURT:  Yeah, I think both because we're just

22    talking about what the government alleges here and that is what

23    they allege, but also because I do think there's a distinction

24    between the second and third categories, one is tied to medical

25    necessity, one is tied to actual versus billed treatments, I

Dai1zem2

1    think, so I'm inclined to go with that.

2              MR. GARBER:  Before we move off of page 32, though,

3    there was something above that that I failed to mention.  The

4    end of the paragraph which is "It is sufficient" that has now

5    been changed, the last clause in that paragraph, "either of

6    which, if proven beyond a reasonable doubt, will satisfy the

7    first element of the healthcare fraud," I think that clause

8    should be stricken, because now that you've taken out "It is

9    sufficient," you're not highlighting -- you've already told

10   them that there's two ways they can do it.  To then go back to

11   that at the end of this paragraph is a little out of context

12   and I think it should be stricken.

13             MR. SKINNER:  I'm sorry.  You want to strike what?

14             MR. GARBER:  The end of this, this paragraph, the

15   fourth paragraph, it says, "either of which, if proven beyond a

16   reasonable doubt, will satisfy the first element."  I think

17   that clause should be taken out.

18             MR. SKINNER:  That's a correct statement of the law.

19   Why would we take that out?

20             MR. GARBER:  Because I'm trying to -- I think the

21   court overhighlights, okay, these two options, and I think that

22   it shouldn't be in there.  The court already says it once, that

23   there's alternative ways that the convictions can ensue, and I

24   just don't think that that language should be in there,

25   especially since we're changing that "It is sufficient."  I

Dai1zem2

```
 1   just think it reads better and I think it shouldn't highlight
 2   that.
 3           MR. SKINNER:  No, but if we take that clause out, it
 4   suggests to the contrary, that we have to prove both kinds,
 5   which we certainly don't have to do.  There are two alternative
 6   theories, and it should be clear to the jury that, "either of
 7   which, if proven, will satisfy the first element."
 8           MR. GERMAN:  But on page 31, the judge says, "The
 9   first option," and he spells it out.  Then your Honor says,
10   "The second option."  I mean, that's as clear as day that there
11   are two options.
12           THE COURT:  I'm going to keep that part in.  I think
13   it's fine because it's pretty clear there are alternative
14   theories.
15           MR. SKINNER:  Your Honor, also, before we move on into
16   the ownership issue, if that's where we're going next, we had
17   proposed some language in our proposed charge on fraud that
18   we'd like to -- I didn't see, and I may have just missed it in
19   reading this kind of late last night, but we had -- at page 26
20   of our proposed charge, we had language to the effect of, "This
21   element does not require that any particular person actually
22   relied on or actually suffered damages as a consequence of any
23   fraudulent representation or concealment of facts, nor need you
24   find that any of the conspirators, including the defendant you
25   are considering, profited from the fraud."  I think that's a
```

Dai1zem2

1    correct statement of the facts and I think it may be important,

2    depending in particular upon some of the arguments the doctors

3    may make with respect to whether they made a lot of money off

4    of this fraud or not.

5         THE COURT:  Yeah, I think that's correct.

6         MR. SKINNER:  So the issue would be figuring out where

7    to insert that.

8         THE COURT:  Is that part of the first element?

9         MR. SKINNER:  Yes.

10        MR. GERMAN:  Pete, I'm sorry, could you just read that

11    again.

12        MR. SKINNER:  Sure.  "This element does not

13    require --"

14        MR. GERMAN:  Pete, you have to -- you're looking to

15    the right and the mic's not picking you up at all.  That's why

16    we can't hear.

17        MR. GARBER:  What paragraph?

18        MR. SKINNER:  Just the top paragraph, the first and

19    second sentence.

20        MR. GARBER:  Page 26.

21        THE COURT:  The first two sentences of that?

22        MR. SKINNER:  Yes, your Honor.

23        MR. GARBER:  And you want to add something?

24        MR. SKINNER:  Oh, no.  I'm talking about page 26 of

25    our proposed charge.

Dai1zem2

1          MR. GARBER:  Oh.

2          MR. SKINNER:  And I want to insert that language or

3     something to that effect.

4          MR. GERMAN:  Page 26 in ours is Meaning of the

5     Indictment.  That's why everybody's confused.

6          MR. GARBER:  Okay.  So you wanted to alter your

7     request to charge, right?

8          MR. SKINNER:  No.  I want to alter the court's

9     proposed charge to include language that we had in our

10    proposal.

11         THE COURT:  Yeah, I think that's standard language and

12    I think we missed it.  I'll read it to you.  This is on the

13    first element.  "This element does not require that any

14    particular person actually relied on or actually suffered

15    damages as a consequence of any fraudulent representation or

16    concealment of facts, nor need you find that any of the

17    conspirators, including the defendant you are considering,

18    profited from the fraud."  We might have to tweak that because

19    we're not in the conspiracy part yet.

20         MR. SKINNER:  Yes, your Honor, I agree, it definitely

21    needs to be tweaked, but I want the principle to be included.

22         THE COURT:  "It is enough that a false statement or a

23    statement omitting material facts made what was said

24    deliberately misleading was made as part of a fraudulent scheme

25    in the expectation that it would be relied on."  I think that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Dai1zem2

```
 1    goes on page 32, after the materiality paragraph, maybe?

 2              MR. SKINNER:  That would be fine, your Honor.

 3              THE COURT:  So after the third paragraph.

 4              All right.  Should we talk about ownership?

 5              MR. CREIZMAN:  Yes.

 6              THE COURT:  Who's going first?

 7              MR. GARBER:  I may be a little more esoteric so maybe

 8    you can clean house and I'll go first then.

 9              Okay.  I just want to preserve -- I'm hoping I'm not

10    just preserving my record but I'm persuading you, okay, to stop

11    this divide of alternative theories that you've come up with in

12    your charge, and I've been -- I think I understand *Mallela* on a

13    deeper level than I did in the beginning of this trial and

14    throughout the course of this case, but I made some comments

15    yesterday and I want to make sure that they're understood.  My

16    understanding of the genesis of *Mallela* is that there was

17    concern about no-fault mills or abuse, and the reason why they

18    created this statute, or these rules, okay, to stop

19    nonprofessionals from owning is because they wanted to stop

20    unnecessary medical services and they did not want the

21    insurance companies to be saddled with this problem.  So it's

22    not in isolation, and it is a -- it was designed to stop that,

23    okay, and if it's not connected to unnecessary medical

24    services, it's just like a rule that's kind of floating out

25    there and a way for insurance companies to fail to pay
```

Dai1zem2

1    healthcare providers even though they provided services, and

2    that's -- when I talked about an unlawful taking or unjust

3    enrichment, it's for the healthcare providers.  They're

4    actually providing services, and excellent services in this

5    example, and then the insurance company is saying, you know

6    what, we gotcha, okay, because we don't think that this was

7    adequately owned by a licensed healthcare professional.  Which,

8    by the way, is a complicated analysis, fact-based analysis.

9    And at its core it's somewhat rogue, at least to me, under

10   American jurisprudence, but it got to where it got I think

11   because of the legislature's concern about unnecessary

12   services, okay, and it's in there, okay?  But what the Second

13   Circuit did -- and they were troubled by this, as I understand

14   it, reading their opinion, and in 2004 they certified this

15   question up to the New York State Court of Appeals.  But what

16   they talk about -- and this is the Second Circuit -- is they

17   say that there are criminal penalties that exist in this area.

18   For example, if a medical license is obtained fraudulently,

19   okay, that can be prosecuted criminally.  And then after

20   *Mallela*, after it goes up to the New York State Court of

21   Appeals in 2005, there was some legislative changes that are

22   made, and those legislative changes target decertifying

23   facilities, okay, that violate this fraudulent incorporation

24   rule.  But that's it.  They have the option to criminalize this

25   and they don't.  They talk about decertification.  And there's

Dai1zem2

legislation post New York State Court of Appeals *Mallela*.  And
that's as far as they go.  For a criminal court to then take
this to the level that you're taking it at I think is not only
dangerous, okay, but I think it's just wrong, because without
it being tethered to these underlying principles that caused
the rule to be created, you're saying that if the insurance
companies are successful in lobbying for a rule that says that
they don't have to pay under certain circumstances and that
doctors knowingly violate that rule or anybody knowingly
violates that rule, that's criminal, okay, it's like akin to
saying -- and I hope that this makes sense, okay -- they have a
rule that says, an NF3 has to be prepared a certain way.  It
has to be prepared in black ink, for example, okay, but if you
prepare it and they're prepared in blue ink, okay, aha, we
don't have to pay you because you violated that rule, okay?
And doctors knowingly violate that rule.  I mean, it's kind of
a maybe overly simplistic, you know, example, but I'm saying,
without the underlying principles of that -- of that fraudulent
incorporation, that concept of ownership being put on there,
it's essentially just a technical rule, okay, and to
criminalize it, in isolation, which is what you're doing,
you're not saying this has to be tethered to unnecessary
medical services or some other, you know, manner of defrauding,
you know, the insurance companies, where they're actually
defrauded to the point where they're hurt, okay, you're not

Dai1zem2

1    saying that, you're saying in isolation --

2            THE COURT:  No, I understand, but the prosecution

3    isn't relying on a state statute.  There's a federal, general

4    fraud statute -- several, right? -- and they refer to, you

5    know, myriad representations that may have to do with things,

6    property ownership under state law, immigration law, whatever

7    it is, and it comes within mail fraud, insofar as it meets the,

8    you know, prongs of mail fraud, and ownership and property

9    things are generally determined by state law.  So it's not as

10   though you're taking the state law and making that the criminal

11   statute, it's just the representation has to do with ownership,

12   which is something that is governed by state law.

13           MR. GARBER:  But -- no, I get that.  But -- okay.

14   First of all, I guess I said two things.  Criminalizing

15   *Mallela*, okay, I think is problematic, okay, as a policy, from

16   a policy perspective, but putting that aside, what it is at its

17   core is a rule, this ownership rule, okay, that has a -- that

18   has a purpose behind it, and the purpose behind it is to stop

19   unnecessary medical services, it may be excessive and all this

20   other stuff, okay?  That's why it's there, okay?  And to say to

21   a jury, okay, you can find these defendants guilty just on the

22   violation of that ownership statement alone, okay, I just don't

23   think it makes sense, okay, because it's just fundamentally

24   unfair.  It's an arbitrary rule in isolation, okay?  If it's

25   tethered to some other nefarious conduct, then it's not, and

Dai1zem2

1    here you're untethering it.  It's standing alone in isolation.

2    And another way -- and I'm just trying -- I'm communicating

3    this hopefully effectively in different ways.  It's no

4    different than a technical rule, like, for example, you

5    check -- and I'll -- maybe I'll go the ink thing.  You check

6    employee when it should be independent contractor, okay, in the

7    box.  The insurance company doesn't have to pay in that

8    situation.  If there were a wholesale knowing violation of that

9    box violate -- that, you know, they're still providing the

10   services, and this is the type of thing that if an insurance

11   company looked at it, would say, you know what, as long as that

12   other doctor, okay, is not billing independently for it, no

13   harm, no foul.  And that's a problem.  And, you know, so I just

14   think that you're on very, very -- not only dangerous ground

15   but incorrect ground that's fundamentally, you know, violative

16   of our clients' right to a fair trial.

17          MR. GERMAN:  Judge, and I'll just add that when the

18   insurance executive was testifying, I asked him specifically,

19   if all of the medical treatments were necessary but you found

20   that there was a problem with ownership, would you have to pay?

21   And he basically said, no, *Mallela* says we don't have to pay.

22   So under this precedent, if there were somebody out there who

23   provided medically necessary treatment 1,000 percent of the

24   time, the precedent we're setting here is that he could be

25   prosecuted criminally for a law, as Mr. Garber points out,

Dai1zem2

which is tethered in unnecessary medical services, and I think that's the real danger.

THE COURT: Okay. But you can only be prosecuted if the elements of the fraud statute are met, that is, it's done wilfully and it's part of a scheme or artifice involving a misrepresentation, etc., with intent to defraud, and it seems to me *Mallela* is kind of a side issue. I mean, it goes to the materiality of the representation or the omission or whatever it is, because it establishes, under state law, the requisite point that insurance companies are in fact able to withhold payment if it's not an actual owner of a PC, and that's what makes it material, but it's not using *Mallela* as the basis for criminal liability, ultimately.

MR. GARBER: But I -- it's a two-tiered argument. The *Mallela* thing I think is the discussion, just to put into context how unfair this is, okay? But we're talking about a technical rule then, okay, and if it's not connected to some sort of -- and you talk about scheme to defraud or some sort of fraud. So like putting in, you know, that, you know, they were an employee as opposed to an independent contractor, I mean, is that a fraud?

THE COURT: Actually, in some contexts it can be. I've seen federal fraud cases where someone, you know, lies on some sort of federal benefits application about whether they had outside employment and, you know, they said they were an

Dai1zem2

independent contractor versus an employee, and that was a

requirement to get a federal benefit, and if you meet the other

elements, that lie on a form to the federal government can be

mail fraud because it meets the other elements of intent to

defraud.

MR. GARBER:  But my understanding is there's a purpose

behind that, the independent, but the employment is some sort

of a factor that they look at to determine whether or not, you

know -- you're talking about immigration, I think, right?  You

know, that they should be able to get a visa or whatever, okay?

Here we're talking about -- and we never fleshed out at this

trial, and I think we were stopped from doing it, you know,

whether or not an insurance company would pay if, you know,

there was a technical violation in these forms.  And we never

were really able to get into that.  And, you know, I don't see

how the ownership issue, without connection to some sort of

underlying fraud, they're trying to steal -- pointing to the

guy from Allstate -- trying to steal money from insurance

companies, okay, you know, without that, okay, I don't

understand how, you know, it could be left in isolation.  I

understand, okay, that, you know, a scheme to defraud, you

know, you could -- you could defraud in many ways, okay, but

you're still -- when you strip this all out, okay, without some

sort of, you know, medically unnecessary or excessive or

upcoding problem, okay, it's just a technical rule, and I just

Dai1zem2

1    think that that's very problematic, okay, as far as, you know,

2    criminalizing it here in this trial.  Putting aside New York

3    law.

4                THE COURT:  Okay.  Do you want to respond?

5                MR. SKINNER:  Your Honor, we have no response.  This

6    is an issue that's been ruled on by the court multiple times

7    already.  We understand the defendants don't like it, but it's

8    been resolved.  And the only issue now is how the jury is

9    instructed on it, and it's late in the day, and I suggest we

10   move on to that.

11               MR. FISCHETTI:  Well, before we move on, Judge, here's

12   my position with this, without going into all the legalese with

13   regard to it.  It's a very difficult issue for us because

14   *Mallela* deals with civil penalties.  Taking the example that

15   there is an absolute fraud on the PC, on the NF3, where the

16   doctor actually doesn't sign, you sign for the doctor, open up

17   a PC, I'll sign for you, Dr. So-and-So.  So there is -- there's

18   no question that that was done improperly and there's a fraud.

19   All the medical treatment is done properly.  There's no

20   excessive billing, there's nothing.  An insurance company

21   doesn't pay because they find out that this has been done

22   wrongly, incorrectly, fraudulently, anything you call it, but

23   no one has been defrauded on it other than civilly.  There was

24   no excessive billing, there was nothing else, just take that in

25   a vacuum.  Now I'm not going to reargue all this, Judge,

Dai1zem2

because we've gone through it a hundred times.  I do have an
objection to some of the language here.  But I think since we
have to live with this, Judge, and it is a problem for us, that
at the end of this there should be some language about specific
intent to defraud or what -- defraud insurance companies.  We
have to have something in there that basically prohibits the
jury from finding that perhaps the doctor just signed the
agreement and just left and everything else was done properly,
especially since my client and Mr. Danilovich do the business
end of it.  There's no question that the insurance company
doesn't pay, and if the insurance company does pay because of
that technical violation, in my opinion, that's not criminal
fraud, that's civil fraud.

          THE COURT:  That's a fair point, and I think we
addressed that.  I do have specific intent to defraud on 35, I
think.  I say, you know, they must act knowingly and wilfully.

          MR. FISCHETTI:  Well, the ownership you don't, your
Honor.  There could be a line just at the end of that with
regard to ownership.

          MR. SKINNER:  Well, your Honor, if you want to do
misrepresentations in billings before misrepresentation in
ownership, then the specific intent language will follow
directly after the misrepresentation in ownership.  The
specific intent language is there and there's no dispute that
there's a difference between a misrepresentation and one that's

Dai1zem2

1    made with the intent to defraud, and that is why these

2    misrepresentations are not floating in the ether.  That is why

3    this is not a strict liability case.

4            THE COURT:  Would that help to put misrepresentations

5    in billing first?

6            MR. SKINNER:  We would have no objection to that, but

7    I don't think there's any reason to add anything.

8            MR. FISCHETTI:  That would help.

9            MR. SKINNER:  It follows immediately after --

10           MR. FISCHETTI:  Mr. Skinner, that will help.

11           THE COURT:  So we'll make that A and ownership B?  I

12   think that works.  And then I do say, to act with intent to

13   defraud means to act wilfully and with the specific intent to

14   deceive for the purpose of causing some financial loss to

15   another.

16           MR. FISCHETTI:  Judge, I have, if I may, a pretty

17   serious objection to some of the language on page 34, if

18   we're --

19           MR. CREIZMAN:  I have some objection, though, on 33,

20   if I could.

21           MR. FISCHETTI:  Go ahead.

22           MR. CREIZMAN:  Yes.  It's to the last paragraph.

23   There's language in the last paragraph on page 33 which I think

24   endorses the government's theory of ownership, of paper

25   ownership, and it diminishes the significance of legal indicia

Dai1zem2

1    of ownership vis-à-vis domination and control and profit, which

2    is the second and third factors the court has set forth for the

3    jury, and specifically the language is "formal designations"

4    and then the last two sentences of the paragraph.  I would

5    propose a new paragraph, replacement paragraph as follows,

6    which is:  "First, consider who owns the shares of an entity.

7    Also consider who has other legal rights in an entity, such as

8    the right to bind the entity to contracts, sell the entity, or

9    to dissolve the entity.  These considerations are probative but

10   not necessarily conclusive of true ownership."

11           THE COURT:  Could you repeat that first sentence.  I

12   want to make sure --

13           MR. CREIZMAN:  Sure.  "First, consider who owns the

14   shares of an entity.  Also, consider who has other legal rights

15   in an entity, such as the right to bind the entity to

16   contracts, sell the entity, or to dissolve the entity.  These

17   considerations are probative but not necessarily conclusive of

18   true ownership."  I have it written out if you want to see it.

19           THE COURT:  Okay.

20           MR. SKINNER:  Your Honor, our problem with that would

21   be, he's basically taking one concept, who has legal ownership,

22   and trying to split it into two different things, I mean, who

23   owns the shares and who has other legal rights, and there's --

24   it's all one thing -- who has the legal ownership of the

25   company.  That's a factor that the jury can consider.  That

Dai1zem2

1    factor is not conclusive, not decisive in this case.  We think

2    it's properly described by the court in what you have here.  I

3    mean, we certainly can't cut the quotations you have from the

4    applicable cases.  I mean, I think it's -- it is the law, and

5    the jury should be instructed on it.

6        THE COURT:  You would cut the quotations?

7        MR. SKINNER:  No.  We think the quotations should

8    remain.

9        THE COURT:  Oh, I was going to cut them.

10       MR. CREIZMAN:  I would just say about quotations,

11   there's also -- the Supreme Court stated in *Dole Foods*, "In

12   issues of corporate law, structure often matters," so that's

13   why I believe that the language from whatever case this is

14   from, I think it endorses one theory over another theory.  It

15   diminishes the significance of legal ownership.

16       MR. SKINNER:  And we think it properly puts in context

17   legal ownership.  I mean, it's -- as most charges try to do,

18   it's presenting both sides of how this factor should apply.

19       MR. GERMAN:  I mean, Judge, we're looking at the case

20   where that comes from, and, you know, that's a Second Circuit

21   civil law case, and to the extent we're going to use that kind

22   of language, you know, I think it's fair to use the kind of

23   language in *Dole*, but I think rather than have these kind of

24   different civil languages, one from the Court of Appeals and

25   one from the US Supreme Court, that Mr. Creizman's suggested

Dai1zem2

1       charge makes sense.

2               MR. SKINNER:  Your Honor, *Dole* was a completely

3       different case, completely different regulatory backdrop.  It

4       doesn't have any applicability here, as we've argued numerous

5       times already in our briefs to the court.

6               THE COURT:  Yeah, I mean, the question of ownership I

7       think is a question of New York civil law, ultimately --

8               MR. SKINNER:  Yeah.

9               THE COURT:  -- property law.  I mean, I think some

10      version of what you said, I agree that it shouldn't be broken

11      out into two things but something about formal legal

12      designations of ownership, you know, first you should consider

13      formal legal designation -- well, how did you put it again?

14              MR. CREIZMAN:  I said, "First, consider who owns the

15      shares of an entity.  Also, consider who has other legal rights

16      in an entity, such as the right to bind the entity to

17      contracts, sell the entity, or to dissolve the entity.  These

18      considerations are probative but not necessarily conclusive of

19      true ownership."  And also, deleting the quotes obviates the

20      air quotes problem.

21              THE COURT:  You would delete the air quotes.

22              MR. CREIZMAN:  Yes, I would delete, in this -- on this

23      page, yes.

24              MR. SKINNER:  Your Honor, we wouldn't have a problem

25      with deleting the quotation marks themselves.  I thought you

Dai1zem2

1    meant delete the language.  What Mr. Creizman wants to do I

2    think is akin to what we want to do when talking about the

3    second and third factors, which is adding examples of what the

4    court means.  I mean, you're laying out the legal concept in

5    isolation, which is one way to do this, and we, you know, we

6    had suggested examples, for example, with control, you know,

7    listing examples, it's like hiring and firing, choosing a

8    location, renting the equipment, and the court elected not to

9    include those, which is fine, but I think the approach should

10   be the same for all the factors.  We should either have the

11   concept followed by examples or we should just have the concept

12   and leave it for argument and for the jury to figure out what

13   fits within those categories.  So again, we would, you know --

14   we would object to the change proposed by Mr. Creizman.  If

15   it's adopted, then we think we should spend some time

16   fashioning examples to include in the second and third factors

17   as well.

18            MR. CREIZMAN:  Your Honor, just to make clear about

19   the quotations, I think that the quotations from -- that are

20   here with the ellipses adds to the, you know -- basically just

21   undermines this theory, the idea of legal ownership, and in

22   favor of this paper ownership theory.  It waters it down, as

23   they say.

24            THE COURT:  Yeah, I'm inclined to take out the quotes

25   and ellipses.  I think since legal rights is a little bit more

Dai1zem2

1    difficult to understand, we do have one example, such as

2    possession of shares, and I think it's fair to put in the other

3    example you give, which is rights to enter into contracts or

4    sell, buy or sell, something like as you do it.

5               Anything else on that one?

6               MR. SKINNER:  Can we get that again, Mr. Creizman?

7               MR. CREIZMAN:  I'm going to go slow.  "First, consider

8    who owns the shares of an entity."

9               MR. SKINNER:  Can we go back to just sticking with as

10   the court has it, "formal designations of ownership such as the

11   possession of shares and --"

12              THE COURT:  Here's what I'm thinking.  "First, you

13   should consider formal legal designations of ownership, such as

14   who owns the shares of an entity and who has the rights to buy,

15   sell, contract for, or dissolve the entity."

16              MR. CREIZMAN:  The only issue I have with -- is

17   "formal designation."  The very term "formal" actually

18   undermines the -- and waters down the importance of actually

19   having legal ownership and the right to bind the corporation,

20   saying formal, but, you know, just if we take out the words

21   "formal designations."

22              MR. GARBER:  I agree with that because it almost

23   sounds like paper.

24              MR. SKINNER:  Well, that's the whole point, your

25   Honor.

Dai1zem2

1          MR. CREIZMAN:  That's right.

2          MR. GARBER:  It's buying into the government's theory

3     too much.

4          THE COURT:  But I almost think we need something like

5     formal, because in another sense, we're defining legal

6     ownership, you know, in the sense, in the legal sense that the

7     jury has to resolve.

8          MR. GARBER:  How about designations, consider

9     designations?  Mr. Creizman may not like that, but take out the

10    word "formal."  Designations, which is still --

11         THE COURT:  I don't think that's descriptive enough,

12    though.  I mean, I think we are talking about formal legal

13    designations.  I don't think that --

14         MR. SKINNER:  And then we're talking about other

15    designations, and that's the second and third factors.

16         THE COURT:  Yeah.  I'm inclined to keep it that way.

17         Anything else?

18         MR. GERSHFELD:  Judge, I do have one proposal, and I

19    might be a little different than most of the doctors here.  The

20    government made a point to produce my EUO of my client and

21    basically alluded to the fact that she never goes to the

22    facility with the witnesses that testified against what the EUO

23    was there for, for that purpose.  The testimony by the experts

24    pretty much concluded that the doctor does not physically have

25    to be in the facility to be the owner of the PC, and I'd like

Dai1zem2

to highlight that somewhere in the ownership charge, because

unlike the other doctors, I don't know what the standard for

them is, but to own an MRI facility, the doctor themself does

not physically have to be there in order to be the owner of

that facility.  So I proposed language for the charge, and I'd

like to read it to you and see what the comments would be on

it.

            MR. SKINNER:  Well, your Honor, before we do that, I

mean, our objection would be that that's not a legal charge.

That's a -- that's an argument to be made to the jury about how

to apply the legal charge.  So I don't -- we would object to

adding anything into the charge with respect to whether an

owner has to be at the clinic or not.  And I also don't think

that the evidence has been conclusive on that fact.

            MR. GERSHFELD:  Well, Judge --

            MR. SKINNER:  It's a factual argument.

            MR. GERSHFELD:  What was that?

            THE COURT:  He said it's a factual argument.  But if

you want to say what you propose at least for the record.

            MR. GERSHFELD:  Sure.  Well, first I'd like to say

that Dr. Zarick was on the stand and he basically said the only

time that a clinician has to be at an MRI facility is if, one,

it's a Medicare facility, or two, if there was an MRI taken

with contrast.  In any event, none of those two issues are the

subject of this case, and therefore the law is pretty clear

Dai1zem2

1    that she doesn't have to be in the facility to be designated as

2    the owner, so my instruction, if your Honor would listen, would

3    be, "I instruct you as a matter of law that all medical service

4    corporations in New York State must be owned, operated, and

5    controlled by a licensed medical practitioner.  In addition,

6    for a medical service corporation in New York State to be

7    eligible for reimbursement under the state's no-fault --

8    no-fault auto accident insurance program, the medical

9    professional corporation, or PC, must be owned, operated, and

10   controlled by a licensed medical practitioner.  However, a

11   licensed medical practitioner may own, operate, and control a

12   medical service corporation without being physically present

13   there."

14          MR. GERMAN:  Judge, I just want to clarify, one, what

15   Dr. Zarick actually said was that a medical doctor does not

16   have to be on the premises at all, even when they're using

17   contrast, unless the contrast procedure is for Medicare.

18   That's actually what he said.

19          THE COURT:  I mean, I think that's a fair point for

20   argument, but I just don't know that that goes to the ownership

21   instruction.  I mean, I think you can argue it, certainly.

22          MR. GERSHFELD:  Well, Judge, I think the government

23   has confused the jury by putting that EUO in, which is the

24   subject of another charge I'm going to request after.  They

25   basically made it seem that my client -- well, they read the

Dai1zem2

1    EUO into the record and basically made it seem that my client

2    was there two to three times almost every day or two or three

3    times -- two or three hours every day, whatever the EUO

4    actually stated, and then they put on three witnesses to

5    rebuttal that testimony, which made it seem as if she was never

6    there, and because she was never there, therefore she doesn't

7    own or operate or control the facility.  But the law doesn't

8    require her to be there.  So I'd like to make that clear

9    because the inference now is because she's not there, she's not

10   in control of the PC, but that's not true.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DAi5zem3                    Charge Conference

 1           MR. SKINNER:  First of all, I don't know why we are
 2      talking about what the law requires.  Dr. Zarick a doctor, he
 3      wasn't an expert on any legal issues.  He wasn't asked to offer
 4      any opinions on what the law requires.  The physician's
 5      presence at the clinic, I think, is a fact that is relevant to
 6      considering the dominion and control that they exercised over
 7      the facility.  They were there all the time that would suggest
 8      they had more control.  If they were never there that would
 9      suggest they might have had less control.  These are facts that
10      can be argued to the jury as relevant to dominion and control
11      but there is no reason to include it in a legal charge and I
12      will leave it.
13           MR. GERSHFELD:  Judge, I believe the government argued
14      that if she is not there they may argue that with other factors
15      but that factor alone, whether she is there or not does not
16      necessarily mean, in and of itself -- does not mean that she
17      doesn't own, operate or control the PC, that factor with
18      others.  I don't want the jury to get confused by the fact that
19      just because she wasn't there doesn't mean she doesn't own or
20      control or operate her PC and that's what I'm afraid the jury
21      may have inferred from what the government did on their direct
22      case.
23           THE COURT:  Yes.  I mean, I just don't think it is the
24      place -- he wasn't testifying -- I don't even know what the law
25      is.  He might have testified to his understanding as a doctor

1  or something but I don't think it goes here and it is not fair

2  for argument so I am not inclined to add that to this

3  instruction.

4         MR. FISCHETTI:  Judge, can I go back to 34, ownership?

5         There are several words in there that I don't believe

6  belong there, especially with the defense that we are offering.

7  It says the second set of factors you can consider to determine

8  ownership is responsibility for the financial risk and

9  benefiting from the financial gains of an enterprise.

10        First of all, I object to the word enterprise and say

11 that your Honor say "entity" rather than "enterprise" since we

12 have an enterprise corruption charge.  But I think it should

13 read:  The second set of factors you can consider to determine

14 ownership is the responsibility for the financial risk of an

15 entity you may consider who receives the greatest financial

16 profit when the entity does well and who loses the most

17 financial investment if it fails.  That's fair.  But to say

18 benefiting for financial gains when it is entirely proper for a

19 doctor and a PC to hire management companies to manage their

20 PC, those words "benefiting from the financial gain," I think,

21 can be used by the jury to infer that doctors can't pay anybody

22 with regard to managing their clinic.  I don't think it takes

23 anything away from what your Honor says because by taking it

24 out it says is responsible for the financial risk.  You agree

25 with that, right?  And you may consider who receives the

1    greatest financial profit -- not benefit, profit -- when the

2    entity does well, and who loses the most financial investment

3    if the entity fails.  I think that's fair, Judge, and I think

4    he should remove the words benefiting from the financial gains.

5         MR. MYERS:  Judge, I'm going to ask that you add a

6    little qualifier in there:  But you may also consider that the

7    owner does not have to be the sole beneficiary or person who

8    profits.  I think that's the point.  There are many people who

9    can profit.  The owner himself doesn't have to be the sole

10   person.

11        MR. SKINNER:  Well, no.  I mean, to the contrary.  You

12   can't.  I mean you are not supposed to be sharing the profits

13   of a corporation with a non-medical professional.  There has

14   been testimony from the insurance company executive that that

15   matters and it is material to them who is receiving the

16   profits.  So, we would certainly object to Mr. Myers' proposed

17   change.  We just think it is not correct.

18        THE COURT:  So, Mr. Fischetti's point was to take out:

19   And benefiting of an entity, but then keep in that next

20   sentence?

21        MR. FISCHETTI:  I just want to say benefiting from the

22   financial gains.  And I think to make it even more sensible we

23   can say benefiting from the financial gains of a professional

24   corporation because that's what we are really talking about

25   here.  And you may consider who receives the greatest financial

1    profit when a financial corporation does well and who loses the

2    most financial investment if the professional corporation

3    prevails.  I just don't want to be stuck with the jury

4    considering that the professional corporation from the gains

5    that it's making, the benefits that it is making, is using that

6    money for management services.  I think that's fair, Judge.

7            MR. GARBER:  I think the whole paragraph is

8    problematic because --

9            MR. FISCHETTI:  Can we just talk to mine first?

10            MR. GARBER:  You're done?

11            THE COURT:  Before we get to yours, Mr. Garber, are

12    you guys okay with --

13            MR. SKINNER:  If I understood, and I'm sorry if I lost

14    track, but it seemed at the end of the day the proposal was to

15    change "enterprise" to "professional corporation" which we

16    wouldn't have any objection to.

17            THE COURT:  I kind of liked keeping it "entity"

18    because I enjoyed --

19            MR. SKINNER:  "Entity" is fine too.

20            THE COURT:  He wanted it to be "entity" but then for

21    the last part he prefers "professional corporation."

22            MR. FISCHETTI:  I have no objection to "entity."

23            MR. SKINNER:  "Entity" is fine with us.

24            THE COURT:  And the main was and taking out "financial

25    gains" but then keeping the next sentence:  You may consider

1    who receives the greatest financial profit, etc.

2         MR. SKINNER:  I thought Mr. Fischetti said he didn't

3    mind about that one.

4         THE COURT:  No, no.  He is okay with the second

5    sentence, just take out "and benefiting from the financial

6    gains" which I think is okay because it is covered in the next

7    part.

8         MR. SKINNER:  We don't disagree, your Honor.  I think

9    it is basically the exact same thing, who gets the greatest

10   financial profits.

11        THE COURT:  Mr. Garber, did you want to address yours?

12        MR. GARBER:  The problem I have with it, in general,

13   is that this is the belief that the doctors, at least from the

14   doctor's standpoint, had when they incorporate and you are

15   talking about a continuum here and I'm not sure exactly how the

16   language getting changed but responsible for the financial risk

17   and benefiting from the financial gains and then talking about

18   when the entity does well and who loses the most if the entity

19   fails, I just think that opens up this thought process for the

20   jury that this is over a period of time and it is really what

21   the doctors believed when they incorporated.  I think it should

22   be simplified and it should say something along the lines of

23   the:  The second set of factors you can consider is who

24   receives the greatest financial profit and just leave it that

25   simple.  That's the language I think that comes out of -- it is

not Mallel, I think it is Caruthers which is one of the cases

we argued pretrial and I think you are expanding this concept

beyond that and also opening up this continuum thing which then

takes it away from the thought process when they incorporated

at the inception which is what this is all about.

MR. SKINNER:  We would disagree with that.  What this

is all about is misrepresentations over time to insurance

companies about who the owner of the company is.  So, I mean,

this is not a fraud that's committed when the articles of

incorporation are filed.  That's not the misrepresentation

really that is at issue here.  It is when, in Section 17 of the

NF-3, the doctors repeatedly represent themselves to the

insurance companies to be the owners.  So, it is a fraud that

occurs over time.

And then also it shouldn't be limited just to profit

because who bears the risk?  Who put the money in as well as

who gets the profits?  And that is from -- we took it when and

I think we were more detailed about what we thought should be

in there from Caruthers.

MR. GARBER:  The other point is "entity," we believe,

should be changed to PC.

MR. GERMAN:  Yes.

MR. FISCHETTI:  That's what we suggested too, Judge.

I know your Honor doesn't want it the other way.

THE COURT:  I don't feel strongly.

1              Does the government have any issue with that?

2              MR. MYERS:  We don't mean globally over the whole

3    course.

4              THE COURT:  Just for the second set of factors.

5              MR. GARBER:  "Enterprise" which has now been changed

6    to "entity" should now be changed to "PC" in the second set of

7    factors.

8              THE COURT:  But not the first?

9              MR. GARBER:  I think it should -- actually, I was

10   going to go back to that.  I think it should be throughout this

11   entire page 33 and 34 it should be PC throughout.

12             THE COURT:  These have general instructions on

13   ownership.

14             MR. SKINNER:  This is not who owns the shares.  The

15   point is that it is broader than who owns the shares.  We are

16   not talking about just the professional corporation and just

17   the legal indicia of ownership, we are talking about the entity

18   and who actually owns it.

19             MR. GARBER:  Well, what is the entity?  From the

20   doctor's perspective it is their individual practices.  They

21   don't own the facilities, they're not claiming to own the

22   facilities.

23             MR. MYERS:  All the individual PCs.

24             MR. GARBER:  The theory is that they may need their

25   license to be able to run a medical practice out of a facility

1    but they're essentially owning the doctors' PCs.

2              MR. MYERS:  And they're not responsible for the entire

3    clinic at Atlantic Avenue, for instance.

4              THE COURT:  We do go back to PCs after the third

5    factor.

6              MR. GARBER:  I did misspeak, actually.  It is not page

7    33, PC starts on page 34 at the top and then continues through

8    the third set of factors and there is only actually three

9    changes then.  "Enterprise" becomes "PC," "entity" becomes "PC"

10   in the third set twice.

11             THE COURT:  In the paragraph after the third set,

12   right?

13             MR. GARBER:  It is already in there, isn't it?

14             THE COURT:  The way I have it it is just entity and

15   then in the paragraph after the three factors, based on a

16   thorough consideration of these three types of factors, then we

17   say "PC."

18             MR. GARBER:  That's right, but I'm saying above that I

19   have had.

20             THE COURT:  You are saying to make it all PC whenever

21   we say entity.

22             MR. GARBER:  Top of page 34.

23             THE COURT:  Well, and if we are going to do that we

24   should do it on 33 as well, I assume.

25             MR. GARBER:  Yes, yes.  That's right.  That's right.

DAi5zem3                    Charge Conference

1    I don't know that there is that many of them there but that's

2    correct.

3             THE COURT:  Is it okay with the government to just

4    change entity to PC?

5             MR. SKINNER:  Your Honor, we view NV being another

6    descriptor of PC in the first paragraph in the

7    misrepresentation about ownership section anyway so, no, we

8    don't object to changing it.  It is fine.

9             THE COURT:  Okay.

10            MR. FISCHETTI:  And "beneficial gains" is out, Judge?

11            THE COURT:  Yes.

12            MR. FISCHETTI:  That's what I asked for.  Thank you.

13            THE COURT:  Let me just make sure I caught these.

14            MR. GARBER:  I think we are almost done with

15   ownership, okay?

16            MR. SKINNER:  We have one suggestion in the third

17   factor but if you have something different before that?

18            MR. GARBER:  I have just a couple minor things that go

19   back in time on this misrepresentation and ownership.  I don't

20   know if you want to cover your part first.

21            MR. SKINNER:  Why don't we --

22            MR. GARBER:  Finish it and I will clean up a little,

23   if I could.

24            MR. SKINNER:  Okay.

25            Your Honor, our suggestion with respect to the third

1    factors would be to add to the second sentence.  We think that

2    dominion and control is a little bit too narrow because it

3    seems to focus primarily on create, sell, destroy and direct

4    the assets of the entity seems to be focusing on the shares or

5    the physical assets of the entity.  We would like to add

6    something to the effect of:  As well as who has the power to

7    direct how the professional corporation is operated, because we

8    think there is a lot of indicia of ownership that go into you

9    can hire and fire, who is determining the rental agreements,

10   who is determining the schedules and things like that.  So, we

11   would like some language that makes clear that those are things

12   the jury can consider.

13            MR. GERMAN:  Judge, that's a factual argument.

14   Absolutely.  They're free to make those arguments.  We are free

15   to make other arguments that aren't necessarily in the charge.

16            MR. GARBER:  What I was going to suggest which might

17   cover this is it sounds as if these three sets of factors are

18   exclusive and it would seem to me that they should be it

19   that -- there should be some language in there that there may

20   be others, these are not all inclusive.

21            THE COURT:  Is that okay with the government?

22            MR. SKINNER:  We don't have a problem with making

23   clear that these are a non-exhaustive list of factors.

24            THE COURT:  Among the factors you should consider.

25            MR. SKINNER:  That's fine.  But we do think that in

DAi5zem3                    Charge Conference

1    discussion and explaining what dominion and control it should

2    be clear that we are not just talking about the assets of the

3    professional corporation, it is, you know --

4              THE COURT:  That's tricky, though.  I was actually

5    trying to avoid "operate" because just in reading all these New

6    York cases we sort of distilled it down to these three factors

7    and I don't know, the power to operate gets you into the gray

8    area.

9              MR. SKINNER:  We had testimony from the insurance

10   company witness that what matters to the insurance company is

11   not -- they look to see and if are you trying to figure out who

12   the true owner of the place is you, look to see who can direct

13   what happens there and that would include things like hiring

14   and firing, staffing and things like that.

15             THE COURT:  But that sounds like management --

16             MR. SKINNER:  Well, I mean, I think --

17             THE COURT:  -- as a legal matter.

18             MR. SKINNER:  I think that an argument can be made

19   that a manager can be hired but if the owner of the -- if the

20   person who is purporting to be the owner of the company doesn't

21   have any of those powers, then that's important and there has

22   been evidence here, for example, with regard to Dr. Geris, that

23   he wanted to make hiring decisions, like hiring his wife; and

24   he wasn't able to do it.

25             THE COURT:  None of these examples you are giving have

DAi5zem3                         Charge Conference

1    nothing to do with what the legal ownership definition should

2    be under New York Law.

3          MR. SKINNER:  No, but it goes to what dominion and

4    control means within the definition of ownership.  We shouldn't

5    be excluded from arguing these things and perhaps Mr. Garber is

6    right that it is included within a catch-all.

7          THE COURT:  I will think about that and you are not

8    precluded from arguing because I am saying it is ultimately a

9    question for the jury and I will think about that but I'm not

10   going to promise it.

11         MR. FISCHETTI:  Judge, as you think about it, I think

12   you said the key words talking about that, that that is a

13   management company, Judge, and it is an issue for the jury.  He

14   can argue whatever he wants but if we have a valid management

15   agreement that we consider valid that allows my client to hire,

16   to fire, if your Honor uses that language you are just about

17   directing a verdict.

18         MR. SKINNER:  Oh.  We are not suggesting that the

19   Court should include hire or fire in there.  To the contrary,

20   we are saying that who has -- and it doesn't have to be the

21   power to operate but some indication that who exercises control

22   over the day-to-day operations is relevant to dominion and

23   control over the entity or professional corporation, however we

24   are going to describe it.

25         MR. FISCHETTI:  I don't agree, but I can't object to

DAi5zem3                      Charge Conference

1    that.  What I do object to is if your Honor gives examples such

2    as hiring and firing.  That I object to.

3              MR. SKINNER:  And we are not asking for that, your

4    Honor.

5              THE COURT:  Okay.

6              MR. GERMAN:  Well, I think it is fine just the way it

7    is.

8              THE COURT:  What is that?

9              MR. GERMAN:  I said I think it is perfect just the way

10   it is.

11             THE COURT:  Well, thank you.

12             MR. GARBER:  Just for the record, while you are

13   thinking about it, we would object to any sort of references to

14   operation because we do think it takes out this whole notion.

15   Management is okay and once you start going down the operation

16   road you start to undo --

17             THE COURT:  I think I agree with that.  I am going to

18   take one more look at it but I think I agree with that.  It is

19   certainly something that you can argue.

20             MR. GARBER:  Just a couple other minor things on this,

21   if you are ready.

22             THE COURT:  Yes.

23             MR. GARBER:  So, when you say these three sets of

24   factors, this is page 33, I think it should say "may" instead

25   of "should" because you are also saying that they're not all

1   inclusive.

2           MR. SKINNER:  I'm sorry.  Where are we?

3           MR. GARBER:  33; three sets of factors may inform your

4   finding on ownership.

5           MR. SKINNER:  No objection.

6           MR. GARBER:  Also, up above that, and this is just two

7   lines above starting:  Were not held under their names.  It

8   should say were not incorporated under their names.

9           THE COURT:  Is that okay?

10          MR. SKINNER:  I'm sorry.

11          MR. GARBER:  The word "held" suggests that it is --

12          MR. SKINNER:  No objection.

13          MR. GARBER:  We are done with fraudulent

14  incorporation.

15          THE COURT:  Anything else on fraudulent incorporation?

16          MR. SKINNER:  Should it be not incorporated?

17          MR. GARBER:  Were not incorporated.  Held gets

18  replaced with incorporated.

19          MR. SKINNER:  I see.  I'm sorry, your Honor.  It is

20  fine.  I was thinking it is not with respect to Mr. Zemlyansky

21  and Mr. Danilovich.

22          THE COURT:  Right.  Okay.

23          Okay, what is next?  Knowingly and willfully?

24          MR. SKINNER:  Our next change would be on page 36 with

25  conscious avoidance.

1              MR. MYERS:  Judge, I'm sorry.  Can we go back to page

2    34 at the bottom?

3              THE COURT:  Yes.

4              MR. GERMAN:  Hold on.

5              (counsel conferring)

6              MR. GARBER:  Let's start with, this is page 34,

7    misrepresentation in billing, and this third line down:  Caused

8    to be submitted fraudulent insurance claims for medical

9    treatments that they knew that, and you would insert after that

10   they "they knew."

11             MR. SKINNER:  Your Honor, we have directly following

12   this section an instruction on knowingly and willfully.  There

13   is no reason to incorporate that element into the

14   misrepresentation element.  They're separate concepts and we

15   don't need to be reinforcing over and over again.

16             THE COURT:  I think that's right.

17             MR. GARBER:  Okay.  Well then just to preserve this

18   further, when you go back to misrepresentation about ownership

19   in the first paragraph we do think that you determine that they

20   knew were not in fact the owners and that they knew were in

21   fact owners of the PCs, we think that should be in there too,

22   but you understand the logic of that fails under your ruling.

23             THE COURT:  Okay.  Knowingly and willfully.

24             MR. SKINNER:  We have nothing, your Honor.  On 36 we

25   did.  Sorry.  I don't know if the defendants have anything

DAi5zem3                    Charge Conference

1   before that.

2            MR. GARBER:  Conscious avoidance?

3            MR. SKINNER:  Yes.

4            MR. GARBER:  Yes.

5            Okay, I have two words:  Rick Debiasi.  And I'm going

6   to just quickly, okay, there was a section of his plea

7   allocution that was taken out and I was cross-examining him

8   about that and before lunch he was very equivocal on whether or

9   not he knew what he was doing was wrong, and this was a guy who

10  was -- there was kickbacks associated with it and I believe

11  fraudulent incorporation.  Then what happened after lunch was

12  Rick Debiasi was rehabilitated by Mr. Noble, very effectively,

13  with the end of the plea allocution where he said then:  The

14  court accepted your plea?  But the whole middle section where

15  he's fumfering around and everybody, by the way, is fumfering

16  around about whether or not he did anything wrong is taken out.

17           I think that's terribly unfair in conjunction with a

18  conscious avoidance charge because here is a guy who is a

19  businessman, chiropractor, and he doesn't even know what he is

20  doing is wrong.  So, if they're going to be arguing that the

21  defendants knew or should have known what they were doing was

22  wrong getting involved in these clinics or these PCs, there was

23  evidence out there that even somebody who was sophisticated

24  didn't understand it and we were prevented from making that

25  argument effectively through Rick Debiasi's testimony.

1           So, I don't think they should be able to benefit from

2    a conscious avoidance charge under these circumstances.

3           MR. GERMAN:  Judge, I would just add that that's not

4    their theory.  I mean, they've put on witness after witness

5    that say these doctors absolutely knew what was going on.  So,

6    to somehow allow them now to argue in the alternative that,

7    well, we have all our evidence that suggests that they did know

8    but even if they didn't know and they turned the blind eye

9    they're guilty anyway, it just seems that they would be

10   speaking out of both sides of their mouth.

11          MR. SKINNER:  Your Honor, look.  I don't have the

12   cases in front of me because frankly I didn't think we were

13   going to be arguing about the propriety of a conscious

14   avoidance instruction and I think it is a necessary instruction

15   because I think in a case like this it obviously applies

16   because the Second Circuit has held, I can proffer, because I

17   have briefed it recently, that the government is well within

18   its rights to make alternative arguments that the defendants

19   actually knew what was happening and, even if they didn't, that

20   there was conscious avoidance and the evidence of actual

21   knowledge can be used to prove conscious avoidance.  Clearly,

22   this is a case where conscious avoidance applies.

23          THE COURT:  I agree.  I am inclined to include it.  I

24   mean I know there was -- I think it is sort of an alternative

25   theory.  There is a lot of evidence about a lot of different

1    things and I think one of, you know, in various situations

2    there is evidence from which a jury can conclude that the

3    deliberate -- it does say deliberate, that they deliberately

4    closed their eyes to what otherwise would have been obvious and

5    I think that's a fair charge.

6          MR. GARBER:  I would then, in the alternative, I would

7    ask you to martial this charge and make reference to Rick

8    Debiasi and Sander Koyfman's testimony.

9          MR. SKINNER:  What does one have to do with the other,

10   your Honor?

11         MR. GARBER:  This is a due process argument that I am

12   making.  We were prevented, okay, from fully developing how

13   complicated, ambiguous this concept of fraudulent

14   incorporation.  And kickbacks, by the way, are to people who

15   have been in the profession for many, many years.  We were

16   hamstring on that front and for you to now capitalize or

17   exploit this novel theory buttressed by conscious avoidance

18   which, by the way, I understand the Second Circuit has allowed

19   and so has essentially every other circuit in the country, but

20   there was a lot of litigation that surfaced.  It tampers with

21   the burden of proof and it tampers with proof beyond a

22   reasonable doubt and just because the Second Circuit says it is

23   okay it doesn't mean it is not a marginal concept that cuts the

24   heart of our rights as criminal defendants.  It is there but

25   you shouldn't be able to exploit it and at the same time

1    exploit it in a case where we are prevented from developing

2    things that could speak to it.

3         MR. SKINNER:  I think there is ample opportunity by --

4    defense counsel in this case exploited to some degree of

5    success to develop the complicated nature of the facts that are

6    at issue.  I don't think that the portion of Mr. Debiasi's plea

7    transcript that was excluded was relevant and was properly

8    excluded.  I also don't think that any legal charge should be

9    hinged back to the specific facts of what a particular witness

10   was permitted to testify to.

11        Conscious avoidance is the law.  The Second Circuit

12   said it is proper.  It applies in cases like this and we would

13   object to excluding it or to hinging it back to Mr. Debiasi's

14   testimony.  And our only change is minor and it is the

15   beginning of the third-party, rather than saying an argument by

16   the government of, just starting that sentence with conscious

17   avoidance is not a substitute for proof.  Just capitalize the C

18   on conscious avoidance and start the sentence right there.

19        THE COURT:  Say that again?

20        MR. SKINNER:  Just delete the phrase "an argument by

21   the government of."

22        MR. GERSHFELD:  Judge, I would object to that.  That's

23   the government's position.  They're changing the theory and the

24   jury should know that it is their choice to change that theory.

25        MR. SKINNER:  Look.  It is a suggestion, your Honor.

1    It is also not -- it is not crucial.  It is our suggestion if

2    we can move on.

3            MR. GERMAN:  We object.

4            THE COURT:  I'm going to keep it as it is.

5            Wait.  Conscious avoidance is not a substitute for

6    proof?  That doesn't make sense, does it?

7            MR. SKINNER:  Let's just leave it as it is, your

8    Honor.  We are fine with it.  I am looking at our proposed

9    charge, it was in our proposed charge so let's keep it in.

10           THE COURT:  Okay.  What is next?

11           MR. SKINNER:  The good faith defense.  The government

12   has an objection to both good faith defense and fundamental

13   ambiguity defense.  We feel more strongly about the fundamental

14   ambiguity defense and that's for the reasons that we explained

15   in the letter we sent.

16           THE COURT:  Let me tell you, part of the reason I am

17   inclined to take out the fundamental ambiguity defense I think

18   some of the reasons are stated in your letter, but also I think

19   some of the work that is done by that defense is in the good

20   faith defense.  I mean, I do say in the good faith defense --

21           MR. SKINNER:  That's fine, your Honor.  We don't

22   dispute the Court certainly has the discretion to include it.

23   We think both of these are really just the flip side of the

24   intent coin.  I mean, it is all the government has to prove

25   intent but certainly we're -- we have strong feelings about the

1   fundamental ambiguity and we would object to that and we can

2   live with the good faith defense because we know the Court has

3   the discretion to include it and there is plenty of Second

4   Circuit law saying that it is permissible.

5         MR. CREIZMAN:  The only issue I think would be the

6   representation, the statement that is the basis of the fraud,

7   at least on the ownership issue is the NF-3 and it is a

8   question about who is the owner and what are your licensing

9   credentials and if that's ambiguous and someone could interpret

10  that reasonably to mean that the paper owner of the PC, for

11  lack of a better word, I think that requires this charge or --

12        MR. SKINNER:  Your Honor, this is not a case -- this

13  is not a false statement case, it is a fraud case.  Fraud is

14  broader than false statements and our allegations of fraud are

15  not limited to the NF-3.  For example, Dr. Gabinskaya

16  testified, we believe falsely, in the EUO to an insurance

17  company in furtherance of the fraud with regard to her

18  ownership.  So, it is not like if the jury were to find that

19  the NF-3 were confusing the defendants win.  There is plenty of

20  other evidence here.

21        But, in any event, look.  I agree with the Court.  I

22  think that what is trying to be addressed here is covered by

23  the good faith defense and I think that there is a number of

24  problems with the fundamental ambiguity defense that we

25  explained in our letter.  I mean, it just doesn't apply in

1    fraud cases.

2            MR. GARBER:  Although it is not a false statements

3    case it is a material misrepresentation case and the material

4    misrepresentation centers around that question of ownership in

5    the NF-3.  So, think it begs for this fraudulent or this

6    fundamental ambiguity language.  You can collapse the two.

7    Maybe there is a way to, you know, streamline and put it into

8    the good faith section.

9            THE COURT:  But the way the law has used fundamental

10   ambiguity seems to be, as a matter of law, I, Appellate Court,

11   conclude that, you know, this thing is fundamentally ambiguous

12   so I don't know that that line of cases, when I looked at them,

13   it actually didn't seem to be in the context of jury

14   instructions to tell the jury what was -- I mean it almost

15   seems like a Rule 29 motion at the end of the case where I look

16   at the evidence and I say, well, what evidence was there that

17   there was a false representation -- misrepresentation about

18   ownership?  Do I, as a matter of law, determine that that was

19   fundamentally ambiguous as opposed to the jury deciding that.

20           MR. GARBER:  If you are going to deny this and you are

21   going to take this out I would move to amend our Rule 29 motion

22   and argue that that question is fundamentally ambiguous and cut

23   the doctors out of the fraudulent incorporation component of

24   this charge.

25           MR. CREIZMAN:  I refer to my Rule 29 statements of

1    yesterday.

2            THE COURT:  What's that?

3            MR. CREIZMAN:  I refer to my Rule 29 statements of

4    yesterday in the case with the fundamental ambiguity.  That is,

5    I think, part of my Rule 29 motion.

6            THE COURT:  Right.

7            MR. SKINNER:  Look.  I think it really goes to it

8    would be like dismissing the indictment.  It is before you even

9    get to the trial but, in any event, for purposes of the

10   instruction, we think it is not part of the Court's

11   instruction.  If they want to include it as part of the Rule 29

12   argument, that's fine.

13           THE COURT:  Let me ask you a related question which is

14   when I think about a Rule 29 motion or motions after a verdict.

15   I have been planning to do a general verdict form along the

16   lines of what the government submitted but one thought I had is

17   that, you know, there is two distinct types of fraud alleged.

18   Would it make sense to do a special interrogatory or something

19   to sus out whether the jury is finding fraud on one theory

20   versus the other.  It might just complicate things too much.

21   I'm not sure if it is worthwhile.

22           MR. SKINNER:  We think that's right.  Typically you

23   only do a special verdict form where there is a different

24   statutory maximum, where there is some difference in the

25   punishment that might play that, for instance in a money

DAi5zem3                    Charge Conference

1    laundering statute.

2              MR. GARBER:  We agree with that, by the way.

3              MR. SKINNER:  That's fine.

4              THE COURT:  You agree.

5              MR. GARBER:  We don't think we need a special verdict

6    form.

7              THE COURT:  Okay.

8              Anything else after that one?

9              MR. SKINNER:  We have one change on page 38.

10             THE COURT:  Yes?

11             MR. SKINNER:  The parties have stipulated with respect

12   to venue as well as interstate commerce so I think where they

13   come up we should just be noting the parties have stipulated

14   that the interstate commerce requirement was satisfied in this

15   case.  So, for instance, in the last sentence on 38, rather

16   than saying I will provide more detailed instructions on

17   interstate commerce, later we think the Court can simply say

18   the parties have stipulated that the interstate commerce

19   requirement was satisfied in this case.

20             THE COURT:  Any objection?

21             MR. GERMAN:  No, your Honor.

22             THE COURT:  Great.  But we do want the stuff that I

23   have there about health care benefit programs?  Oh, I say, I

24   instruct you as a matter of law that they are health care

25   benefit programs.

1            MR. SKINNER:  Yes.  I think you already did that in

2    that one.

3            THE COURT:  Okay.  And that's the same of the RICO

4    charge, the interstate commerce?

5            MR. SKINNER:  Yes.  That's correct, your Honor.

6            THE COURT:  Yes.

7            MR. SKINNER:  For all the counts in the indictment as

8    well as the money laundering charge.

9            THE COURT:  Okay.

10           MR. SKINNER:  So, we had it on page 43, 49, 51 and 57.

11           MR. GERMAN:  What is that, Peter?

12           THE COURT:  That's the interstate commerce.

13           MR. GERMAN:  Okay.

14           THE COURT:  Is that right?

15           MR. SKINNER:  Yes.  That's the one we just did.

16           In addition at page 38, the interstate commerce

17   appears on pages 43, 49, 51 and 57.

18           THE COURT:  Okay.

19           MR. CREIZMAN:  If Mr. Skinner could just repeat this?

20   I just couldn't hear.

21           THE COURT:  The pages?

22           MR. CREIZMAN:  No, the issue on those pages.

23           THE COURT:  The parties have stipulated that the

24   interstate commerce element is satisfied in this case.

25           MR. CREIZMAN:  Oh.  Okay.

DAi5zem3                    Charge Conference

1           MR. SKINNER:  Your Honor, I'm sorry, it is actually,

2   it is not on page 43.  I think I misread the note.

3           THE COURT:  We can just search for it.

4           MR. SKINNER:  That's fine, your Honor.

5           THE COURT:  We will give it another look as well, but.

6           MR. SKINNER:  Thank you.

7           We then had a change on 45.

8           THE COURT:  45.

9           MR. SKINNER:  After the paragraph that quotes the

10  statute, I think it should say in order to prove a defendant

11  guilty of mail fraud rather than health care fraud.

12          THE COURT:  I'm sorry.  Say that again?

13          MR. SKINNER:  After the paragraph that quotes the

14  statute.

15          THE COURT:  Yes.

16          MR. SKINNER:  The next paragraph there says in order

17  to prove a defendant guilty it says of health care fraud.

18          THE COURT:  Right.

19          MR. SKINNER:  It should be mail fraud.

20          THE COURT:  Yes.

21          Anything else?

22          MR. SKINNER:  In the venue section on page 62, again,

23  we should make a notation that the parties have agreed that the

24  venue requirement has been satisfied with respect to each count

25  of the indictment.

1          THE COURT:  Shall we just take it out?

2          MR. SKINNER:  I think --

3          THE COURT:  Okay.

4          MR. SKINNER:  I think we should probably just note

5    that it is stipulated.  I understand why you are saying we

6    should just take it out but I'm not sure if that is proper or

7    not since it is actually a requirement of the statute.

8          THE COURT:  Okay.

9          MR. SKINNER:  Then the only other thing that I have is

10   on page 67.

11         Sometimes the Courts will instruct the jury to vote

12   for a foreperson or that the person in chair 1 is the

13   foreperson.  I wasn't sure if the Court wanted to give them any

14   idea what to do because often times the first note out is how

15   do we pick a foreperson.

16         THE COURT:  Yes.  I think I'll add something in there

17   just telling them to choose a foreperson as soon as they start.

18         MR. SKINNER:  Okay.  That's fine, your Honor.

19         MR. NOBLE:  And, your Honor, I just note for the

20   record that Mr. Zemlyansky's name in the caption, it is missing

21   the H, and I believe it is spelled with an H on some of the

22   other pages.

23         THE COURT:  Yes.  We caught that.

24         MR. NOBLE:  Okay.

25         MR. SKINNER:  And also Mr. Fischetti had wanted to

1    strike the a/k/a Russian Mike from the caption because there

2    was no evidence that he was referred to as Russian Mike.  We

3    agree with that and we will redact that out of the -- if the

4    Court is going to send an indictment to the jury we will

5    prepare a redacted indictment that takes it out.

6              MR. CREIZMAN:  On that note, I also believe there was

7    no evidence as to Mike Daniels.

8              MR. SKINNER:  That's fine too -- oh.

9              MR. KIM:  That was in a phone call.

10             MR. SKINNER:  Mr. Kim is telling me there was a phone

11   call where he was referred to as Mike Daniels.

12             THE COURT:  Okay.

13             MR. CREIZMAN:  Well, the Fat should be spelled

14   P-H-A-T.  I'm sorry.

15             THE COURT:  Was there a Slim?

16             MR. CREIZMAN:  Yes, there was.

17             MR. GERMAN:  There was reference to Slim.

18             THE COURT:  Do you want to keep those in?

19             MR. SKINNER:  We think we should keep them in because

20   there was evidence that he was referred to by the nicknames.

21             THE COURT:  You were joking about the P-H-A-T?

22             MR. CREIZMAN:  Yes.  Definitely.

23             MR. GERMAN:  Your Honor, just one last issue and it is

24   probably, I don't know if it would be ZZ or AA, you ran out of

25   letters in the alphabet in your introductory instructions, but

1   I would ask for the same limiting instruction that you gave on

2   voir dire regarding Dr. Vitoulis' suspension.

3           THE COURT:  Where is that?

4           MR. GERMAN:  I'm just saying in terms of where to put

5   it, I guess it would be part of the introductory instructions.

6   But, on voir dire you gave an instruction at the opening of the

7   case about a suspension and I forget the exact language.  I

8   could find it, obviously in the transcript, and I will be happy

9   to just verbatim type it out and send it to your chambers.

10          THE COURT:  I said something about it is just a civil

11  matter and --

12          MR. GERMAN:  I will find it in the transcript.

13          THE COURT:  Do you want a section on that referring to

14  him specifically or --

15          MR. GERMAN:  Yes.  I mean, he is the only one, so.

16          THE COURT:  Okay.

17          MR. GERSHFELD:  Judge, on page 16 I missed --

18          THE COURT:  Sorry to interrupt.  Should we include

19  that under the section on criminal statutes only?  Would that

20  make more sense?

21          MR. GERMAN:  Yes.

22          THE COURT:  And if you don't mind, if you could find

23  the language and you can send it to the chambers e-mail?  That

24  would be great.

25          MR. GERMAN:  Will do.

1              THE COURT:  Okay, sorry.

2              MR. GARBER:  Are you permitting the indictment to go

3     to the jury?  I would object.

4              THE COURT:  Okay.  I hadn't decided but I was sort of

5     assuming I would just because, you know, I have been very clear

6     and I will be very clear that it is just an allegation and it

7     is a way of making the government's allegations but sometimes

8     it is helpful for them to go through to organize what they have

9     to cover, I guess.

10             MR. GARBER:  My objection is it is a speaking

11    indictment which means that it tells a story and it tells a

12    story in very descriptive language that I think is not

13    appropriate.  I mean, I keep talking about the user -- that the

14    defendants exploited the user-friendly aspects of the no-fault

15    law and I have a big problem with that.  I think it is

16    surplusage and shouldn't come in and there may be other

17    surplusage in their story-telling part of this indictment and I

18    just don't think it should go to the jury.  It marshals things

19    for them in a way that is inappropriate.  And although, you

20    know, it is only an allegation, I just don't think that it is

21    something that they should be touching and reading and digging

22    their teeth into -- sinking their teeth into.

23             MR. GERMAN:  On that point, predominantly people of

24    Russian decent and somehow impugning that there is something

25    wrong with that.  I just think there is a lot of language in

DAi5zem3                    Charge Conference

1    there, your Honor, that if we are going to start --

2              MR. CREIZMAN:  On that point though, if I may just?

3              MR. KIM:  Maybe to short circuit this, we can take a

4    stab at redacting the indictment appropriately, we can discuss

5    that with defense counsel and see if we can come to an

6    agreement.

7              MR. CREIZMAN:  I had a motion.  One of my pretrial

8    motions was to strike surplusage, specific lines, things like

9    Russians and others, and other crimes and things like that.  If

10   the government can review that as well that would be helpful.

11             THE COURT:  Yes, I think that would be ideal, if I can

12   give them something without some of that language.  Why don't

13   you try to work on that.

14             MR. KIM:  We will do that, your Honor.

15             THE COURT:  Great.

16             MR. GERSHFELD:  Judge, page 16, first paragraph, it is

17   referenced "he" is innocent.  It should be he or she is

18   innocent."  Last sentence of the first paragraph.

19             (continued on next page)

20

21

22

23

24

25

Dai1zem4

1          THE COURT:  Yeah, got it.  Thank you.

2          MR. GERSHFELD:  And, Judge, one more request, and I

3    believe the People kind of opened the door to this request.

4    Advice of counsel charge.  The government put forth an EUO of

5    my client with Matt Conroy, and pretty blatant and obvious that

6    Matt Conroy is basically taking control of this EUO in many

7    ways.  The interpreter -- the stenographer that was here to

8    authenticate the document, I asked her on cross whether they

9    had breaks and whether my client spoke to her lawyer and sought

10   advice from the lawyer, and I think, if I'm not mistaken, she

11   said yes, that there were breaks and they were speaking amongst

12   one another and went back on the record.  So there was

13   conversations on and off the record, and now I'm more concerned

14   about the conversations off the record, and I think those rise

15   to the level of advice of counsel defense, and I believe the

16   government is the one that opened the door to that.  I

17   referenced it in my opening, that she sought advice of an

18   attorney to incorporate -- I mean, to start the PC and do the

19   contract with the management company, but -- and I was

20   anticipating calling my client as a witness, but then after

21   that EUO came in, I kind of changed my mind and so did she, but

22   I think that it still rises to that level because there were

23   those conversations off the record that I think the jury can

24   infer that the lawyer was giving her advice.

25          MR. KIM:  Your Honor, we are a far cry away from what

Dai1zem4

1    is sufficient for a charge on the good -- on the advice of

2    counsel defense being merited.  I think the law is crystal

3    clear on what you need to show in order to merit a charge like

4    that.  One of those is that I think you disclose the full scope

5    of your involvement in whatever you're doing to the attorney,

6    then you received advice, I mean, good faith relied on that

7    defense -- or on that advice.  Dr. Gabinskaya could have agreed

8    to take the stand and try and put enough testimony in the

9    record that she could merit such a charge, but based on the

10   simple facts elicited on a cross-examination that a court

11   reporter saw Matthew Conroy advising Dr. Gabinskaya off the

12   record, that's not even close to -- or talking to her, not even

13   what the nature of the advice was or whether it was small talk

14   versus legal advice, he's nowhere near meriting a charge on

15   this.

16          MR. GERSHFELD:  Well, Judge, we can kind of conclude

17   that it was more or less along the lines of legal advice

18   because he's taking control of the EUO.  The government put

19   that EUO into evidence where he's blatantly answering questions

20   for her.  So I would assume that those conversations off the

21   record were of that nature, and I think it does rise to that

22   level, and I believe I should be entitled to that charge.

23          THE COURT:  My understanding is that it takes more

24   than what there was in the record, but if you want to submit

25   something, I'll take a look at it, and I'll take a look at the

Dai1zem4

1    cases, but my sense is that there's not enough basis to put in

2    an advice of counsel language, but if you submit something, you

3    can give some proposed language as well.  Just send it to the

4    chambers e-mail address.  I'm going to be coming in this

5    weekend.

6                MR. GERMAN:  Your Honor, I'm sorry, I'm sorry to have

7    your law clerk have to do more work, but apparently our

8    transcript for the trial starts with openings, so I don't have

9    those preliminary instructions that you gave during voir dire.

10   I don't have that part of the transcript.

11               THE COURT:  Oh, that was during voir dire?

12               MR. GERMAN:  It was while we were picking the jury.  I

13   guess there were veneer persons at that point.  And that's when

14   you gave that limiting instruction.  I don't know if the

15   government has that part of the transcript?

16               MR. SKINNER:  No.  We don't usually order that part of

17   the transcript.

18               MR. KIM:  We don't get jury selection generally.

19               MR. GERMAN:  Me neither.

20               THE COURT:  So I gave the instruction during voir

21   dire?  That's odd.

22               MR. GERMAN:  Sure.  Absolutely.

23               MR. GARBER:  The question about it.  It was a voir

24   dire question to them about this issue.

25               THE COURT:  Oh, got it.  Okay.  I remember.

Dai1zem4

1          MR. GERMAN:  Oh, it may be in the voir dire

2     questionnaire, actually.  I don't know if you did that off the

3     cuff.

4          MR. CREIZMAN:  I just don't remember whether that was

5     part of the voir dire.

6          THE COURT:  I may have the transcript.  I may be able

7     to find it.  Or if you want to propose some language, you can

8     just send it in by e-mail.

9          MR. GERMAN:  All right.

10          THE COURT:  Anything else?

11          MR. FISCHETTI:  Yes, Judge.  I've got an easy one.  In

12     the indictment they list as an a/k/a --

13          MR. KIM:  We raised that.

14          THE COURT:  We did that already.

15          MR. FISCHETTI:  Oh, good.

16          THE COURT:  We're taking out --

17          MR. FISCHETTI:  On the verdict sheet and the

18     indictment.  Does your Honor send the indictment in?  I'm just

19     curious.

20          THE COURT:  We addressed that briefly.  I would

21     normally, but you're going to work on a redaction of material

22     that the defendants think should be out.

23          MR. FISCHETTI:  Thank you, your Honor.

24          THE COURT:  Anything else?

25          MR. GERMAN:  No, sir.

Dai1zem4

1              THE COURT:  All right.  Have a good weekend,

2       everybody.

3              ALL COUNSEL:  Thank you, your Honor.

4              (Adjourned to October 21, 2013, at 9:30 a.m.)